[No. B075538. Second Dist., Div. Four. May 12, 1994.]

THE STATE OF OREGON et al., Petitioners, v.
THE SUPERIOR COURT OF LOS ANGELES COUNTY, Respondent;
THELMA LILLARD, Real Party in Interest.

1552

COUNSEL

Theodore R. Kulongoski, Attorney General (Oregon), John R. McCulloch, Jr., Rodney K. Norton, Ginsburg, Stephan, Oringher & Richman, William H. Ginsburg, George J. Stephan and Eric J. Diamond for Petitioners.

No appearance for Respondent.

Arnold, Back, Mayfield, Mathews, Wojkowski & Zirbel and Gary D. Arnold for Real Party in Interest.

OPINION

EPSTEIN, Acting P. J.—In this petition for writ of mandate, the State of Oregon, Oregon State University, and Oregon Health Sciences University and Clinics challenge the trial court's denial of their motion to quash (Code Civ. Proc., § 418.10) based on lack of "minimum contacts" and comity. Under the particular facts presented, we find personal jurisdiction over petitioners is warranted, and deny the petition.

FACTUAL AND PROCEDURAL SUMMARY

While a student at Lynwood High School in California, Earnest Killum rose to national prominence as an outstanding basketball player. During his senior year, the head coach from Oregon State University (OSU) came onto the school campus to recruit Earnest to attend OSU and become a member of its basketball team. Specific efforts to recruit Earnest were also made by the assistant coach and the trainer for OSU. As a result of these contacts and recruitment efforts, Earnest decided to attend OSU. He enrolled as a student there in September 1990. He and his mother, Thelma Lillard, were residents of California throughout this time period.

During the 1990-1991 school year, Earnest was academically ineligible to play on the OSU basketball team. He returned to his home in California at the conclusion of the school year. While playing a "pick-up" game of basketball on July 18, 1991, Earnest suffered a minor stroke. He received treatment at St. Francis Hospital and Harbor U.C.L.A. Medical Center in Los Angeles. He was placed on anticoagulant medication, and advised to refrain from any contact sports, long-distance running, and other physically demanding activity until further assessed and cleared for these activities.

According to Ms. Lillard, while Earnest was undergoing treatment at Harbor U.C.L.A. Medical Center, she had a conversation with Sandy Sandago, athletic trainer at OSU. Sandago told her that if Earnest returned to

OSU, he would be given the best medical care available; that they would find out what the problem was because they had the best doctors and the best treatment. She also spoke with Dutch Baughman, the OSU athletic director, who assured her that they would take good care of Earnest and give him any treatment he needed if he would go back to OSU.[1] OSU promised to continue Earnest on full scholarship.

Earnest returned to OSU, where he received medical treatment from OSU doctors and from doctors at Oregon Health Sciences University (OHSU). On or about December 17, 1991, these medical practitioners reduced Earnest's anticoagulation medication, which rendered him eligible to compete as a member of the OSU basketball team.

On January 17, 1992, Earnest was in Los Angeles with the OSU basketball team to participate in games against the University of California of Los Angeles (U.C.L.A.) and the University of Southern California. He suffered a stroke on January 17, and died three days later.

His mother, Thelma Lillard, filed this wrongful death action in Los Angeles Superior Court, asserting claims against the State of Oregon, OSU, and OHSU (collectively Oregon or petitioners).[2] In her first cause of action, she asserted that petitioners were negligent in that they: failed to properly test, diagnose and treat Earnest; failed to properly prescribe medication for him; reduced the dosage of his anticoagulant medication below the proper therapeutic level; failed to fully inform him of his medical condition and the need for further testing; failed to properly monitor his condition; and released him to play competitive basketball. The second cause of action

---

[1]Petitioners objected in the trial court and on appeal to these portions of the Lillard declaration as inadmissible hearsay. A statement is hearsay if it is "offered to prove the truth of the matter stated." (Evid. Code, § 1200, subd. (a).) The challenged statements by Sandago and Baughman were not offered for their truth (i.e., that Oregon would provide the best medical care possible for Earnest). Their purpose was to establish that medical care was promised. They are not hearsay.

[2]Petitioners argue that OSU and OHSU are separate entities, and hence that any forum-related contacts by OSU cannot be imputed to OHSU. Petitioners inform us that both institutions are under the jurisdiction, control and operation of the Oregon State Board of Higher Education. A brief sojourn into Oregon law reveals that the Oregon State Board of Higher Education itself "is not a separate and distinct entity, granted attributes of sovereignty, but is an instrument or arm of the state, charged with carrying out one of the functions of government, to-wit, the education of the peoples of the state. ORS 351.010." (*James & Yost, Inc.* v. *State Board of Higher Education* (1959) 216 Ore. 598 [340 P.2d 577, 578]; see also *State* v. *Reid* (1960) 221 Ore. 558 [352 P.2d 466]; see *Bacon* v. *Harris* (1960) 221 Ore. 553 [352 P.2d 472] [action for personal injuries which occurred at University of Oregon deemed action against the Oregon State Board of Higher Education].) Given the apparent structure of the Oregon university system, we decline to treat OSU and OHSU as separate entities in determining the propriety of personal jurisdiction.

alleged negligence in that petitioners released Earnest to play basketball when they knew or should have known that he was not medically fit and faced an increased risk for thromboembolic events, and when they knew or should have known that a return to competitive basketball required that he reduce his dosage of anticoagulation medication below therapeutic level. Ms. Lillard also alleged that petitioners interfered with Earnest's medical treatment through contacts with his primary cardiologist, and that they falsely reported to Earnest that his mitral valve was "clean."

Petitioners moved to quash service of the summons and complaint based on lack of jurisdiction. They asserted that Oregon did not have sufficient minimum contacts in California to justify California's exercise of jurisdiction. They also asked the court to decline jurisdiction on the basis of principles of comity. The trial court denied the motion. Petitioners challenged that ruling by petition for writ of mandate. This court summarily denied the writ. The California Supreme Court granted review and transferred the matter to us with directions to vacate the order denying mandate and to issue an alternative writ. Having issued the alternative writ and more fully examined the matter, we deny the requested relief.

DISCUSSION

I

■ California's long-arm statute authorizes California courts to exercise jurisdiction over nonresidents on any basis not inconsistent with the federal or state Constitutions. (Code Civ. Proc., § 410.10.) The due process clause of the United States Constitution permits personal jurisdiction over a party in any state with which the party has "certain minimum contacts . . . such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.' [Citation.]" (*International Shoe Co.* v. *Washington* (1945) 326 U.S. 310, 316 [90 L.Ed. 95, 102, 66 S.Ct. 154, 161 A.L.R. 1057].) "If a nonresident's activities are sufficiently wide-ranging, systematic and continuous, it may be subject to jurisdiction within the state on a cause of action unrelated to those activities. However, where the activity is less extensive, the cause of action must arise out of or be connected with the defendant's forum-related activity." (*Walter* v. *Superior Court* (1986) 178 Cal.App.3d 677, 680 [224 Cal.Rptr. 41].)

"By requiring that individuals have 'fair warning that a particular activity may subject [them] to the jurisdiction of a foreign sovereign,' [citation] the Due Process Clause 'gives a degree of predictability to the legal system that allows potential defendants to structure their primary conduct with some

minimum assurance as to where that conduct will and will not render them liable to suit,' [citation]." (*Burger King Corp.* v. *Rudzewicz* (1984) 471 U.S. 462, 472 [85 L.Ed.2d 528, 540, 105 S.Ct. 2174].)

At the hearing on the motion to quash, Ms. Lillard, real party in interest, acknowledged that she was asking the court to assert specific jurisdiction over petitioners, not general jurisdiction. ■ Specific jurisdiction over an out-of-state defendant who has not consented to suit in the forum comports with due process "if the defendant has 'purposefully directed' his activities at residents of the forum, [citation], and the litigation results from alleged injuries that 'arise out of or relate to' those activities, [citation]." (*Burger King Corp.* v. *Rudzewicz, supra*, 471 U.S. at p. 472 [85 L.Ed.2d at p. 541].) "The crucial inquiry concerns the character of defendant's activity in the forum, whether the cause of action arises out of or has a substantial connection with that activity, and upon the balancing of the convenience of the parties and the interests of the state in assuming jurisdiction." (*Cornelison* v. *Chaney* (1976) 16 Cal.3d 143, 148 [127 Cal.Rptr. 352, 545 P.2d 264].) This is the relevant test for specific jurisdiction in our case.

■ When a defendant moves the court to quash service of summons on the ground of lack of personal jurisdiction, the plaintiff has the initial burden to establish, prima facie, facts entitling the court to assume jurisdiction. (*Dialysis at Sea, Inc.* v. *Superior Court* (1989) 216 Cal.App.3d 788, 793 [265 Cal.Rptr. 71].) Once the plaintiff establishes that a defendant purposefully directed his or her activity at forum residents, the burden shifts to the defendant to demonstrate that the assumption of jurisdiction would be unreasonable. (*Ibid.*)

■ Ms. Lillard's showing in this case was that OSU, through its agents, came to California and recruited her son Earnest while he was a high school student in California. OSU offered Earnest a scholarship, which he accepted. Earnest enrolled at OSU in September 1990, but remained a California resident, returning home for the summer at the end of his freshman year. After he suffered a mild stroke in California that summer, agents from OSU spoke with Earnest and with Ms. Lillard, assuring both of them that Earnest would receive proper medical care and treatment if he returned to OSU. Earnest did return to OSU, where he received the medical care and advice which forms the basis for his mother's claims of negligence.

Petitioners "purposefully directed" activities at Earnest and his mother, both residents of California, through the initial recruitment of Earnest during his senior year and his "re-recruitment" the following summer after his first stroke. The second recruitment allegedly included assurances and promises

to Earnest and his mother of top quality medical care and advice for Earnest's medical problems. This litigation is premised on claims that the medical advice and care delivered in accordance with the recruitment promises was negligent, resulting in Earnest's death. Petitioners, having undertaken recruitment activities directed at a specific California resident, could reasonably expect to be subject to liability in California for injury resulting from these activities. Due process demands no more.

In *Dialysis at Sea, Inc.* v. *Superior Court, supra*, 216 Cal.App.3d 788, this court reached a similar conclusion regarding the requisite causal relationship between recruitment of California residents with promises of medical care and injury resulting from inadequate medical services. In that case, plaintiff and her husband entered into a contract to take a cruise arranged by defendant Dialysis at Sea (DAS) on which hemodialysis would be provided under the supervision of a qualified physician. DAS allegedly provided negligent medical treatment, resulting in injury to plaintiff's husband which contributed to his death. The cruise contract involved in the case was negotiated and accepted by plaintiff and her husband in California. The cruise was in the Mediterranean Sea. DAS was an out-of-state corporation. Its communication with individuals in California was solely by telephone or written correspondence. DAS conducted limited mailings of its brochures to kidney centers in California, approximately twice a year.

On review of the trial court's denial of DAS's motion to quash, we adopted the reasoning of the 5th Circuit in *Prejean* v. *Sonatrach, Inc.* (5th Cir. 1981) 652 F.2d 1260: " 'Logically, there is no reason why a tort cannot grow out of a contractual contact. In a case like this, the contractual contact is a "but for" causative factor for the tort since it brought the parties within tortious "striking distance" of each other. While the relationship between a tort suit and contractual contact is certainly more tenuous than when a tort suit arises from a tort contact, that only goes to whether the contact is by itself sufficient for due process, not whether the suit arises from the contact.' " (*Dialysis at Sea, Inc., supra*, 216 Cal.App.3d at p. 795; but see *State ex rel. Circus Circus Reno* v. *Pope* (1993) 317 Ore. 151 [854 P.2d 461, 465-466].)

In our case, petitioners' forum-related activities—direct recruitment of a California resident in California for an athletic scholarship and "re-recruitment" of that resident with assurances that needed medical care would be provided—were contractual contacts which brought Earnest within tortious striking distance of the petitioner medical practitioners. Petitioners brought Earnest to OSU on an athletic scholarship. They encouraged him to return to OSU after his first stroke by assurances that he would receive

proper medical care. That led Earnest to accept the medical treatment and advice from OSU and OHSU medical practitioners which form the basis for real party's claims of medical malpractice. More precisely, these acts of recruitment and re-recruitment of Earnest placed OSU and OHSU in a position in which their advice or failure to advise Earnest with regard to his medical condition and his ability safely to resume playing basketball became critical. Real party established the requisite nexus between petitioners' forum state actions and her causes of action for purposes of personal jurisdiction.

Recruitment of athletes by out-of-state colleges or by professional teams is not an uncommon activity, and on occasion it may result in a lawsuit between the recruiter and athlete. When that happens, the question of jurisdiction arises. For example, in *Martin* v. *Detroit Lions, Inc.* (1973) 32 Cal.App.3d 472 [108 Cal.Rptr. 23], a professional football player was recruited in California by a scout for the Detroit Lions. He was injured during practice in Detroit, and sued in California when the team refused to pay his salary. The Court of Appeal held that California could assert personal jurisdiction over the Detroit Lions, based on activities in this forum: the team scouted and recruited the player in California; the contract was signed in California; the team employed a professional scout, residing in California, who scouted and recruited football players on its behalf in California; the team played a schedule of games against California teams in California, and derived income from paying customers who attended those games. This, the court held, was more than a mere "footfall" within the state, and assertion of jurisdiction would not offend " ' "traditional notions of fair play and substantial justice." ' " (*Id.* at pp. 475-476.)

The Ohio Court of Appeals considered the question in a context strikingly similar to this case, in *Barile* v. *University of Virginia* (1981) 2 Ohio App.3d 233 [441 N.E.2d 608]. Barile was an Ohio resident recruited to play football for and attend college at the University of Virginia. The university promised Barile that he would receive proper medical care and attention for any injuries he might receive while playing football. He broke his wrist while playing football for the university, was treated by the university staff, and underwent surgery on his wrist at a university facility, all in Virginia. He then returned to his home in Ohio where a second operation was performed on his wrist. He was rendered unable to work for over a year. He brought suit against the university for breach of contract in Ohio, and was met by the university's claim of lack of jurisdiction in the Ohio courts. Ohio's long-arm statute, like ours, extends personal jurisdiction of its courts to the constitutional limits. Applying that statute, the Ohio court found a sufficient nexus between the forum and the nonresident to justify the exercise of personal

jurisdiction. The court noted that the university had aggressively pursued the student in Ohio in order to induce him to play football at the university, demonstrating an intent to effect consequences within Ohio.

The court also found that the cause of action arose out of or was connected with activities of the university within Ohio: "The appellee induced appellant to leave Ohio to perform in athletic contests in its behalf. The obvious purpose of the alleged promise of medical care was to encourage the appellant to exert himself to the fullest in football. Appellant's promise, made in Ohio, to attend and perform for the appellee university is manifestly connected with the alleged agreement by appellee to provide medical care." (441 N.E.2d at p. 614.) In light of these facts, the court concluded, exercise of jurisdiction by Ohio courts was fair and reasonable: "The appellee, University of Virginia, should have foreseen that by intensively recruiting an Ohio high school athlete, it might become subject to lawsuits in the state of Ohio for causes of action arising out of promises made to the athlete." (*Ibid.*) The court found the burden on the university to defend in Ohio was slight compared to the burden on the individual in bringing suit in Virginia, and it recognized that the state of Ohio had a substantial interest in protecting the welfare of its residents. "Finally, the efficient resolution of disputes, such as that presented in the case at bar, is more likely to be achieved, if the state courts exercise jurisdiction in cases involving the recruitment of the resident student athletes of that state. This would permit the residents of the state, and the colleges recruiting within the state, to determine with some degree of certainty what law will govern their relationship." (*Ibid.*) All of these factors apply in the case before this court.

A different result was reached in *Gehling* v. *St. George's School of Medicine, Ltd.* (3d Cir. 1985) 773 F.2d 539. Earl Gehling was a Pennsylvania resident who was accepted for admission by St. George's School, located in the West Indies. While in attendance there, he participated in a school-sponsored road race, collapsed, and died. His parents brought a wrongful death action in Pennsylvania, asserting causes of action including negligence and breach of contract. The school's contacts with Pennsylvania included advertising in the New York Times and the Wall Street Journal, enrollment of some students from Pennsylvania each year, and a "media swing" by college officials through several cities, including Philadelphia. The court held that these activities lacked a sufficient nexus to subject the school to personal jurisdiction for claims arising from its non-forum-related activities. Also insufficient was the exchange of correspondence between decedent and the school, which involved decedent's application, St. George's acceptance and matriculation information, and decedent's tuition payment. In holding the contacts inadequate, the court specifically noted the absence of any

evidence that students were solicited during the media swing through Pennsylvania. That, of course, strongly distinguishes our case.

## II

Having concluded that there is a sufficient nexus between petitioners' forum-related activities and the claims being asserted, we turn to the second inquiry: "whether it would be fair and reasonable to subject [petitioners] to the jurisdiction of California in light of the inconvenience to [them] in defending an action in this state, when balanced against the interests of plaintiff in suing locally and of the state in assuming jurisdiction." (*Cornelison* v. *Chaney, supra,* 16 Cal.3d 143, 150.)

■ Petitioners argue that Oregon is the more convenient forum because all the medical care giving rise to this action was rendered there. Equally significant is that both of Earnest Killum's strokes occurred and were treated in California. He underwent extensive testing, diagnosis and treatment in California after his first stroke, and received three days of medical treatment, until his death following his second stroke. While petitioners may be inconvenienced by the need to travel to California to defend this action, they nevertheless will be motivated to make that journey. In contrast, real party has no means to secure the attendance at trial in Oregon of the California medical practitioners who treated her son.

Moreover, California has a strong interest in protecting the rights of its residents who are allegedly victims of medical malpractice. (*Dialysis at Sea, Inc.* v. *Superior Court, supra,* 216 Cal.App.3d at p. 796.) This interest is particularly strong in a case such as this where the out-of-state parties allegedly induced the resident to leave California and accept medical care in that state.

Having balanced the inconvenience to petitioners in defending in this state against the interest of Ms. Lillard in suing locally and the interrelated interest of California in assuming jurisdiction, we conclude that it is fair and reasonable to subject petitioners to the jurisdiction of the California courts.

## III

■ Petitioners, speaking in one voice as the State of Oregon, argue that even if California does have jurisdiction, it should decline to exercise it. They base this argument on principles of sovereign immunity and comity. In *Hall* v. *University of Nevada* (1972) 8 Cal.3d 522 [105 Cal.Rptr. 355, 503 P.2d 1363, 81 A.L.R.3d 1234], the California Supreme Court rejected the

absolute application of sovereign immunity for activities of a sister state within California: "When the sister state enters into activities in this state, it is not exercising sovereign power over the citizens of this state and is not entitled to the benefits of the sovereign immunity doctrine as to those activities unless this state has conferred immunity by law or as a matter of comity." (*Id.* at p. 524.)

After trial of the matter, the Court of Appeal affirmed the trial court's refusal to apply a Nevada statute placing a limit on any award in a tort action against the state pursuant to its statutory waiver of sovereign immunity. (See *Hall* v. *University of Nevada* (1977) 74 Cal.App.3d 280 [141 Cal.Rptr. 439].)

The United States Supreme Court granted certiorari in that case to decide whether the full faith and credit clause of the federal Constitution prohibits the California courts from entering a judgment against the State of Nevada which Nevada's own courts could not have entered, or "from asserting any jurisdiction over another sovereign State." (*Nevada* v. *Hall* (1979) 440 U.S. 410, 411 [59 L.Ed.2d 416, 419, 99 S.Ct. 1182].) In affirming the decision of the Court of Appeal, the Supreme Court explained: "It may be wise policy, as a matter of harmonious interstate relations, for States to accord each other immunity or to respect any established limits on liability. They are free to do so. But if a federal court were to hold, by inference from the structure of our Constitution and nothing else, that California is not free in this case to enforce its policy of full compensation, that holding would constitute the real intrusion on the sovereignty of the States—and the power of the people—in our Union." (*Id.* at p. 426 [59 L.Ed.2d at p. 429].) California is not precluded from asserting jurisdiction over the State of Oregon in this action.

Petitioners may still ask the trial court to apply Oregon law in this action under the doctrine of comity. ▆ Under that principle of law, ". . . the forum state will generally apply the substantive law of a foreign sovereign to causes of action which arise there." (*Wong* v. *Tenneco, Inc.* (1985) 39 Cal.3d 126, 134 [216 Cal.Rptr. 412, 702 P.2d 570].) The doctrine is grounded on respect for the sovereignty of other states or countries, considerations of mutual utility and advantage, as well as business and social necessity. (*Ibid.*) "Our federal system of comity, and the law of conflict of laws, rests on the sound assumption that the courts of one state are able to interpret and apply the law of sister jurisdictions." (*People* v. *Pensinger* (1991) 52 Cal.3d 1210, 1261 [278 Cal.Rptr. 640, 805 P.2d 899].)

Applicability of that doctrine has not been considered by the trial court, and petitioners will have a full opportunity to raise it in that forum.

## DISPOSITION

The petition for writ of mandate is denied.

Vogel (C. S.), J., and Hastings, J., concurred.

A petition for a rehearing was denied June 6, 1994, and petitioners' application for review by the Supreme Court was denied August 18, 1994. Arabian, J., was of the opinion that the application should be granted.