[No. G015188. Fourth Dist., Div. Three. Sept. 30, 1996.]

TRACI PRINCE et al., Plaintiffs and Appellants, v.
GEORGE J. URBAN et al., Defendants and Respondents.

COUNSEL

Philip M. Prince for Plaintiffs and Appellants.

Bonne, Bridges, Mueller, O'Keefe & Nichols, Lisa L. Werries and George E. Nowotny for Defendants and Respondents.

OPINION

SILLS, P. J.—The question of personal jurisdiction over an out-of-state doctor in a medical malpractice action occurs with sufficient regularity that it is the subject of an annotation in the American Law Reports. (See Annot., In Personam Jurisdiction, Under Long-Arm Statute, Over Nonresident Physician, Dentist, or Hospital in Medical Malpractice Action (1983) 25 A.L.R.4th 706.)

In the typical scenario, where a prospective patient travels out of state to a doctor, and there receives allegedly negligent medical treatment, courts consistently hold that the patient's home state courts cannot exercise personal jurisdiction over the physician even though the *effects* of the doctor's negligence are (literally) felt in the patient's home state. (E.g., *Ghanem* v. *Kay* (D.D.C. 1984) 624 F.Supp. 23 [no District of Columbia jurisdiction over Maryland podiatrist who negligently performed surgery on D.C. resident even though podiatrist advertised and listed his phone number in D.C. Yellow Pages]; *Walters* v. *St. Elizabeth Hosp. Medical Center* (W.D.Pa. 1982) 543 F.Supp. 559 [mere acceptance of out-of-state patient by hospital not enough for personal jurisdiction]; *Lebkuecher* v. *Loquasto* (1978) 255 Pa.Super. 608 [389 A.2d 143] [no Pennsylvania jurisdiction over New Jersey physician who rendered services in New Jersey to Pennsylvania resident even though physician was listed in Pennsylvania phone book]; *Cambre* v. *St. Paul Fire & Marine Insurance Co.* (La.Ct.App. 1976) 331 So.2d 585 [no Louisiana jurisdiction over Mississippi physicians who performed surgery in Mississippi]; *McAndrew* v. *Burnett* (M.D.Pa. 1974) 374 F.Supp. 460 [New York doctor left hemostat in Pennsylvania patient's abdominal cavity; held, no jurisdiction even though patient suffered "continuing injury" in Pennsylvania]; *Gelineau* v. *New York University Hospital* (D.N.J. 1974) 375 F.Supp. 661 [New Jersey resident was sent to New York doctor for treatment of aneurysm, contracted infectious hepatitis from a blood transfusion at New York hospital; held, no jurisdiction even though New York doctors knew patient would return home and some members of hospital staff practiced in New Jersey].)

The case before us now, however, is not quite the typical scenario because it does not involve a situation (like malpractice during out-of-state surgery) where a discrete set of services could be said to have been rendered *strictly* outside the patient's home state. Here, a California migraine sufferer was referred by her California physician to an Illinois headache specialist. The California patient traveled to see the Illinois physician and his associate at a headache clinic in Illinois. The patient's headaches subsided and she went back to California armed with a 30-day prescription for various medications. After her return to California she had numerous telephone conferences with the headache specialist (for which she was billed a small fee each time). When her medication ran out, her Illinois doctors arranged to have additional medication mailed to her and on other occasions called prescriptions directly to California pharmacies near the patient's home.

Unfortunately, the medications prescribed by the Illinois doctors rendered the patient so confused and disoriented that she became dysfunctional. After hospitalization at a California detoxification facility she filed this action for medical malpractice.

We now affirm the superior court's order that it lacked personal jurisdiction over the Illinois physicians. Granted, the case *is* a close one. But the balance is tipped in the direction of no jurisdiction by a point articulated by the Ninth Circuit in *Wright* v. *Yackley* (9th Cir. 1972) 459 F.2d 287, which also involved an out-of-state physician who arranged for prescription refills: *a physician's services are personal; they are not directed at a specific location, but at a specific patient.* (See *id.* at pp. 289-290.) By virtue of the "very nature of the average doctor's localized practice, there is no systematic or continuing effort on the part of the doctor to provide services which are to be felt in the forum state." (*Id.* at p. 290.) Thus where, as here, the out-of-state doctor's contact with the forum state consists of nothing more than telephonic follow-up on services rendered in the doctor's own state, it is unreasonable for the patient's home state to exercise personal jurisdiction over the physician. (See *id.* at p. 289.)

## I

Traci Prince suffered from chronic migraine headaches and high blood pressure.[1] In the fall 1991, her local physician, Jon Ahdout, ordered a CAT scan, which disclosed a possible stroke. She consulted a headache specialist at Scripps Medical Institute in San Diego, who suggested she see Dr. Seymour Diamond at a headache clinic in Chicago.

Prince saw Diamond and was hospitalized in his headache unit from October 29 to November 14. He treated her with an assortment of drugs. Prince's headaches subsided, and before leaving Illinois she obtained a 30-day prescription for her various medications. She returned to California, where the regimen continued.

While in California, Prince frequently received medical advice from the clinic doctors by telephone. She spoke with Diamond or with Dr. George Urban or left messages and received return calls from one of them. The clinic charged her $10 for each telephone consultation. When her 30-day prescription ran out, Diamond or Urban authorized refills through a Chicago pharmacy. Later, one of the doctors phoned prescriptions directly to a California pharmacy. Plaintiff returned for a checkup at the clinic in December.

Prince began experiencing energy loss and disorientation and later, in December 1991, hallucinations and delusions which progressively worsened. She returned to the clinic. Again, Prince was given a multitude of medications. She felt better and returned to California, but continued to discuss her condition with Urban by telephone.

---

[1]Prince's children and stepchild are also plaintiffs.

By April, however, she had become dysfunctional; and, on April 12, 1992, she was hospitalized at a Brea psychiatric facility for detoxification and counseling, where she remained for six days. She has not taken the medications since and no longer suffers the adverse symptoms.

Plaintiff filed her complaint in this state for professional negligence, breach of contract, and negligent infliction of emotional distress against Urban, Diamond, and the clinic on March 18, 1993. Defendants were served in Illinois.

The superior court quashed service of summons: "[It would be a very terrible thing if plaintiff] had gone for the treatment and been told by the doctors that if they wanted any follow-up discussion or consultation or prescriptions or advice, they'd have to stay [in Illinois]." The court noted it was "troubled by the concept that . . . doctors in the position of these defendants, would be susceptible to jurisdiction in all 50 states," concluding it "would be improper . . . when they maintain all of their activities and all of their offices and treatment facilities and licensing . . . in Illinois." Moreover, plaintiff "deliberately sought the advice of an Illinois physician and at best as an indirect and derivative result continued with consultation," and that if the court were to find jurisdiction, "the next person that calls . . . the doctor has to then make a decision."

## II

We have already seen that the easy cases are where it is impossible to say that the medical treatment has taken place anywhere else *but* out of the forum state. The more difficult cases are those where some aspect of the relationship does cross state lines.

One aspect of a doctor's practice which may cross state lines is *marketing*. The counterpoint to the traditional "localized practice" of the "average" doctor is the doctor who attains national prominence and specifically *invites* out-of-state patients to come under his or her care. *Bullion* v. *Gillespie* (5th Cir. 1990) 895 F.2d 213 illustrates such a case. There, a California urologist authored a nationally distributed book. A Texas doctor recommended that his patient read the book, and the Texas doctor then contacted the California urologist to have him review the patient's particular problem. The contact resulted in the Texas patient being put on the mailing list for the urologist's newsletter, and a recommendation for a new treatment program in Texas. Additionally, the patient came out to California for an in-person consultation, where the urologist recommended the patient participate in an experimental treatment program he was administering with Food and Drug Administration approval. As part of the program, it was "envisioned" as the *Bullion*

court put it, (*id.* at p. 215) that the patient would receive a certain drug in the mail, and that she would continue visiting her Texas doctor who would report his findings to the urologist. The patient received the drug in the mail from the California doctor and related correspondence.

The patient sued the out-of-state doctor for harm caused by the drug. In holding that a Texas court could exercise personal jurisdiction over the urologist, the Fifth Circuit pointed out the plaintiff was the California doctor's patient "for purposes of the experimental program," kept in regular contact with the plaintiff's Texas doctor, *plus* "administered to the medical needs of other patients in Texas as well." (*Bullion* v. *Gillespie, supra,* 895 F.2d at p. 217.) (The court did not elaborate on other patients who were part of the urologist's sphere of influence.) The court thus concluded that the defendant had sufficient " 'minimum contacts' " with Texas for the exercise of personal jurisdiction. (*Ibid.*)

Even where there is no interstate marketing scheme, there are cases where the *doctor's services* are fundamentally interstate in nature from the inception of the relationship. In *Kennedy* v. *Freeman* (10th Cir. 1990) 919 F.2d 126, for example, the doctor was not some nationally known urological guru. In fact, he did not even solicit the out-of-state business. There was still personal jurisdiction, however, because the doctor-patient relationship was, essentially, a mail-order one.

In *Kennedy*, a Texas doctor received a tissue sample from an Oklahoma physician who took the sample from an Oklahoma patient. After he misanalyzed it and the patient developed malignant melanoma, the Tenth Circuit concluded jurisdiction was proper. Even though the Texas tissue analyst did not solicit the business of the Oklahoma patient, he "purposefully direct[ed] his actions there." (*Kennedy* v. *Freeman, supra,* 919 F.2d at p. 129.) The diagnosis—which was, after all, *the* critical service provided by the Texas doctor—was made "through the mail." (*Ibid.*)

But just because there must be some contact or communication across state lines between doctor and patient does not mean that the prerequisite minimum contacts necessary for personal jurisdiction are present. Follow-up consultation ancillary to the examination and treatment made by the out-of-state doctor, telephone calls about the status of an out-of-state patient, or arrangements for a patient to continue with medication prescribed by that doctor do not reach the minimum contacts necessary for the satisfaction of due process.

In *Muffo* v. *Forsyth* (1976) 37 Ill.App.3d 6 [345 N.E.2d 149], an Illinois patient sought medical treatment from a Missouri physician. Although the

patient had a common reaction to the drug, the physician "continued to prescribe the drug for a lengthy period of time," which caused the patient injury. (*Id.* at p. 150.) The Missouri physician also called in prescriptions to the patient's Illinois pharmacy. In the subsequent malpractice action, the Illinois appellate court rejected the exercise of personal jurisdiction over the Missouri physician, pointing out that he had been sought out by the patient. The court noted that the physician had not directed the patient to have the prescription filled in Illinois, nor accrued any benefit from the fact it was filled in Illinois. (*Id.* at p. 152.)

*Ballard* v. *Fred E. Rawlins, M.D., Inc.* (1981) 101 Ill.App.3d 601 [56 Ill.Dec. 940, 428 N.E.2d 532, 25 A.L.R.4th 699], presents a refrain of the *Muffo* theme. *Ballard*, like *Muffo*, involved a Illinois patient who traveled to see a Missouri obstetrician. The patient was suffering from toxemia, but the physician apparently thought it was nausea, and prescribed a drug which ultimately caused the loss of the patient's baby and harm to herself. As in *Muffo*, the Illinois appellate court rejected the idea that just because an out-of-state doctor called in a prescription to a home state pharmacy there were the requisite minimum contacts. (See *Ballard*, *supra*, 428 N.E.2d at p. 535.)

Perhaps the most thoughtful of the "prescription" cases was handed down by the Ninth Circuit in *Wright* v. *Yackley*, *supra*, 459 F.2d 287. In *Wright*, a South Dakota resident was treated by her South Dakota physician, and at his direction was taking drugs acquired by prescriptions permitting unlimited refills. (*Id.* at p. 288.) She moved from South Dakota to Idaho; eventually she needed refills which her Idaho drug store would only honor with a confirmation of the prescriptions from the doctor. She wrote to her South Dakota doctor and he, without charge, mailed copies of the original prescriptions to Idaho. She was "injured" by the use of the drugs and sued in federal district court in Idaho. The Ninth Circuit affirmed the district court's dismissal for lack of personal jurisdiction.

The Ninth Circuit reasoned that the malpractice really was not an act performed in Idaho. The malpractice took place in South Dakota—the mailing of the original prescriptions was "simply confirmation" of what the doctor had already done there. (See *Wright* v. *Yackley*, *supra*, 459 F.2d at p. 289; see also *id.* at p. 291 ["We conclude that no tort was committed within the State of Idaho . . . ."].)

We describe *Wright* as a "thoughtful" case because the court based its decision on the nature of medical services rather than just declaring that certain services fell on one side of the line (e.g., *Kennedy*) or the other (e.g.,

*Muffo*). The court began its analysis by setting up the problem in terms of the inherent mobility of patients: "In the case of personal services focus must be on the place where the services are rendered, since this is the place of the receiver's (here the patient's) need. The need is personal and the services rendered are in response to the dimensions of that personal need. They are directed to no place but to the needy person herself." (*Wright* v. *Yackley*, *supra*, 459 F.2d at p. 289.)

Having set up the foil, the *Wright* court played off it. It rejected the conclusion that personal jurisdiction should attach wherever the patient goes. "Medical services in particular should not be proscribed by the doctor's concerns as to where the patient may carry the consequences of his treatment and in what distant lands he may be called upon to defend it. The traveling public would be ill served were the treatment of local doctors confined to so much aspirin as would get the patient into the next state." (*Wright* v. *Yackley*, *supra*, 459 F.2d at p. 290.)

The court then set forth three reasons why personal jurisdiction over the South Dakota doctor was unreasonable. First, the amount of contact between the doctor and the forum state was merely a chance occurrence. The "average doctor's localized practice" meant there was no "systematic or continuing effort" to provide services which are to be "felt in the forum state." (*Wright* v. *Yackley*, *supra*, 459 F.2d at p. 290.) Second, the nature of the service was not "grounded outside of any relationship with the forum state." (*Ibid.*) This point was, in effect, a corollary of the court's earlier point about the inherent mobility of patients. "[T]he residence of a recipient in the forum state is irrelevant and incidental to the benefits provided by the defendant in his location." (*Ibid.*) Third, the "dominant interest" of a state is "*not* that they should be free of injury by out-of-state doctors, but rather that they should be able to secure adequate medical services to meet their needs wherever they may go." (*Id.* at p. 291, italics added.)

■ The present case falls in the netherland between *Bullion* and *Kennedy* (jurisdiction) on the one hand, and *Muffo*, *Ballard* and *Wright* (no jurisdiction) on the other. Unlike *Bullion* (the nationally known urological expert), there is no marketing *into* the forum state; unlike *Kennedy* (mail-order tissue analysis), the nature of the services of Drs. Urban and Diamond was localized. Urban and Diamond did, in essence, what every local doctor does every day: They saw Prince in their Illinois offices and they gave her a prescription. Unlike *Muffo*, *Ballard*, and *Wright*, however, they also had a number of telephone conversations with their patient, and, further, charged their patient something for those consultations.

Despite factual differences with the latter three cases, the present case is closer to the no-jurisdiction side of the line because each of the three basic

reasons articulated by the *Wright* court applies. One, the doctor-patient relationship was not the result of any "systematic or continuing effort . . . to provide services" to be "felt" in California, but simply because of a referral by an out-of-state doctor. The fact the Illinois doctors run a migraine clinic which obviously has achieved some renown in headache circles is insufficient to counter the chance nature of the origin of the relationship. (See *Aylstock* v. *Mayo Foundation* (D.Mont. 1972) 341 F.Supp. 560 [no Montana jurisdiction over nationally known Minnesota hospital even though staff physician from hospital visiting in Montana referred Montana patient to hospital].) Unlike *Bullion*, we have no indication that Urban and Diamond attempted to enlist Prince in some nationwide study, i.e., had some purpose for the relationship other than just treating her for her migraine headaches.

Two, the services rendered by Urban and Diamond were clearly not "grounded" in any relationship with California. The essence of the relationship was that the California patient sought out the Illinois doctors in Illinois. (See *Ballard* v. *Fred E. Rawlins, M.D., Inc., supra*, 428 N.E.2d at p. 535 ["As in *Muffo*, the plaintiff initially sought out the defendant for medical treatment."]; *Muffo* v. *Forsyth, supra*, 345 N.E.2d at p. 152 [because plaintiff "sought medical treatment in Missouri" it did not "seem unreasonable to require her to return to Missouri to prosecute any actions arising out of that treatment"].) As in *Wright*, Prince's residence was "irrelevant and incidental" to the services rendered by her physicians. If anything, Prince's California residence hampered the doctor-patient relationship, which existed despite the half continent of separation between the parties.

Finally, the interest of California as a state in insuring the availability of medical care for its citizens dominates over its interest in protecting its citizens from injury by out-of-state doctors. If anything, this factor applies all the more where specialized medical treatment is needed and California citizens must travel out of state to find it.[2]

To this final factor, we add this thought: Specialty care entails follow-up care. A rule which ascribes personal jurisdiction based on what is, as in the

---

[2] We recognize that the traditional language of minimum contacts analysis is framed in terms of "reasonableness" (e.g., *Cornelison* v. *Chaney* (1976) 16 Cal.3d 143, 147 [127 Cal.Rptr. 352, 545 P.2d 264] ["The general rule is that the forum state may not exercise jurisdiction over a nonresident unless his relationship to the state is such as to make the exercise of such jurisdiction reasonable."]; *Kulko* v. *California Superior Court* (1978) 436 U.S. 84, 92 [56 L.Ed.2d 132, 141, 98 S.Ct. 1690] ["Like any standard that requires a determination of 'reasonableness,' the 'minimum contacts' test of *International Shoe* is not susceptible of mechanical application . . . ."]) or "fair play and substantial justice" (e.g., *Circus Circus Hotels, Inc.* v. *Superior Court* (1981) 120 Cal.App.3d 546, 555 [174 Cal.Rptr. 885]) rather than, as in the *Wright* court's phrase, a state's "dominant interest." However, matters of public policy or state interest are clearly relevant as *factors bearing on* the reasonableness of jurisdiction. (E.g., *Edmunds* v. *Superior Court* (1994) 24 Cal.App.4th 221, 226 [29 Cal.Rptr.2d 281] [California public policy of not discouraging out-of-state attorneys

case before us, follow-up care works to the manifest detriment of a state's citizens. To paraphrase the *Wright* court, the citizens of a state are ill-served when specialist physicians feel constrained to prescribe only so much medicine as will get their patients back home.

*McGee* v. *Riekhof* (D.Mont. 1978) 442 F.Supp. 1276 cannot be reconciled with our analysis. We decline, however, to follow *McGee* because its analysis is in several respects not persuasive. In *McGee*, a Montana resident was referred to a Utah eye doctor for retina surgery. After surgery, the Montana patient returned home with instructions to come back to Utah in two weeks for postsurgical treatment. During that interim two weeks' time, the resident's wife was advised to call and report on the patient's progress each week, which she did. During the second call the eye doctor advised the wife that the patient could return to work. Unfortunately, when he did, he suffered a retinal tear. (See *id.* at p. 1277.)

In holding that Montana had personal jurisdiction over the Utah eye doctor in the subsequent malpractice action, the federal district court judge reasoned that "the alleged negligent act [in] advising plaintiff to return to work prematurely—occurred in Montana" because the patient "was in Montana when the diagnosis was rendered." (*McGee* v. *Riekhof, supra*, 442 F.Supp. at p. 1278.) He added it would have been a different case if the malpractice had simply consisted of a negligent eye operation. (*Ibid.*) For the *McGee* court, rather, the malpractice consisted in "diagnosis rendered telephonically *in Montana.*" (*Id.* at p. 1279, italics added.) Indeed, the court styled what the doctor did as providing "a new diagnosis via telephone." (*Ibid.*)

At the conclusion of the opinion, the *McGee* court confronted the state interest problem articulated in *Wright*. (*McGee* v. *Riekhof, supra*, 442 F.Supp. at p. 1279.) "It certainly is not this court's desire to deter interstate medical services, as suggested in the footnote in *Wright*; such services are too beneficial to residents of states like Montana who do not have intrastate access to the more progressive and accomplished medical centers." (*Ibid.*) But then the *McGee* court resolved the problem this way: "However, the desire to maintain access to interstate medical services must be balanced with the need to maintain quality of care. Most assuredly, preservation of interstate medical services will not be achieved by insulating doctors from malpractice claims." (*Ibid.*) Beyond that it did not elaborate.

from representing California residents in attorney's home state supported conclusion that Hawaii attorney did not have requisite minimum contacts with California]; *Judd* v. *Superior Court* (1976) 60 Cal.App.3d 38, 45 [131 Cal.Rptr. 246] [holding that personal jurisdiction over out-of-state father who sent support payments to children in California would be neither "fair" nor "reasonable" in part because of public policy to encourage the payment of support and communication between natural father and his children].)

*McGee* is unconvincing in three respects. One, the idea that the act of malpractice was rendered *in* Montana does not ring true. The error occurred in Utah, where the Utah doctor made his (erroneous) judgment and gave erroneous advice. Its *effect* took place in Montana where the advice was heard and acted on. The idea that an *act* which consists of some form of speech occurs where some recipient hears it or otherwise receives the message is most dubious. (See *Mason* v. *Shelby County Health Care Corp.* (S.D.Miss. 1996) 919 F.Supp. 235 [four telephone calls from Mississippi hospital to regional Tennessee trauma center doctor, including one which concerned a drug to be administered to accident victim and which caused victim's death, were insufficient to establish personal jurisdiction].) *Wright's* point that the inherently mobile nature of patients makes the patient's residence "irrelevant and incidental" to the doctor-patient relationship reflects much more the substance of the situation. The *McGee* court never confronted the passive nature of the Utah doctor's "contacts" with the forum state—he was the one who was sought out by the patient. (Cf. *Muffo* v. *Forsyth*, *supra*, 345 N.E.2d at p. 152.)

Two, the idea that the malpractice in *McGee* was essentially a "new" diagnosis also runs contrary to the fundamental realities of the relationship in that case. Granted, the weekly phone conversation afforded the Utah doctor with additional information. But parsing out the Utah doctor's services between the retina surgery and the follow-up advice given during the recuperative period was unrealistic in the extreme. Both the surgery and the advice were part of one set of services aimed at, essentially, one problem— the patient's retina.

Finally, as to the clash of values between assuring available medical services on the one hand, and protecting citizens from malpractice on the other, the *McGee* court simply chose the wrong side. While the facts in *Gelineau* v. *New York University Hospital* were not as close as the case here, the court there also pointed out the "chilling effect on the availability of professional services to non-residents" that a rule which resolved the conflict in favor of personal jurisdiction would entail. (See 375 F.Supp. at pp. 667-668; see also *Bechard* v. *Constanzo* (D.Vt. 1992) 810 F.Supp. 579, 585 [rejecting idea that medical malpractice tort should be portable].)

Moreover, our point about follow-up care is salient and bears repetition here. Specialized medical care, such as the eye surgery which the patient needed in *McGee*, often requires follow up and monitoring. Again, it is utterly unrealistic to attempt to divide, as the *McGee* court tried to do (and its ratio decidendi necessarily relied on) the follow-up from the initial out-of-state rendition of services. By now courts should be sophisticated enough to

know that medical services are often part of an indivisible package; surgery may do no good without follow-up advice and medicine. A treating physician cannot ethically abandon his or her patient just because the patient is returning home to another state.

Despite *McGee*, we must therefore conclude that the present case is one where the assertion of personal jurisdiction is ultimately unreasonable and unfair. In sum, an out-of-state physician's follow-up care of a patient by telephone—even when the home state patient pays for it—is not a sufficient basis for personal jurisdiction.

## III

The order quashing service of the summons was correct and is now affirmed.

Rylaarsdam, J., concurred.

**CROSBY, J.,** Dissenting.—While there is surface allure to my colleagues' opinion, the rule of law they create is a bad one. I cannot agree that a finding of no jurisdiction is necessary to avoid the shunning of California patients seeking follow-up care from out-of-state doctors and medical facilities. Forum non conveniens motions would dispose of most such cases, I think, and properly so.[1] But there might be good reason to retain a few of them. For example, what of quack practitioners in other jurisdictions with a track record of attracting desperately ill California patients, whether by advertising or word of mouth, who then continue to treat them when they have returned to this state? They ought to expect to be required to defend here. For these reasons I decline to join in today's decision, based as it is on spurious notions of public policy. I would hold they have no proper role to play in a jurisdictional analysis; instead, public policy concerns go to forum non conveniens considerations, in my view.

California's jurisdiction extends to the limits of state and federal due process.[2] (Code Civ. Proc., § 410.10.) Due process requires that a defendant have "minimum contacts" with the forum state "such that the maintenance of

---

[1]This comment assumes there is no procedural bar to the action, e.g., that the statute of limitations has not run or that defendants have agreed to waive it. (See *Stangvik* v. *Shiley Inc.* (1991) 54 Cal.3d 744, 750, fn. 2 [1 Cal.Rptr.2d 556, 819 P.2d 14]; *Shiley Inc.* v. *Superior Court* (1992) 4 Cal.App.4th 126, 130 [6 Cal.Rptr.2d 38].)

[2]The facts were not in conflict; the case presents a question of law. (*Great-West Life Assurance Co.* v. *Guarantee Co. of North America* (1988) 205 Cal.App.3d 199, 204 [252 Cal.Rptr. 363].) Plaintiffs bore the burden of proving minimum contacts (*State of Oregon* v. *Superior Court* (1994) 24 Cal.App.4th 1550, 1557 [29 Cal.Rptr.2d 909]); the burden then

the suit does not offend 'traditional notions of fair play and substantial justice.'"[3] (*Internat. Shoe Co.* v. *Washington* (1945) 326 U.S. 310, 316 [90 L.Ed. 95, 102, 66 S.Ct. 154, 161 A.L.R. 1057].) The test is not "mechanical or quantitative," but depends upon the "quality and nature" of the defendant's activities within the state. (*Id.* at p. 319 [90 L.Ed.2d at pp. 103-104].) Whether a defendant's contacts with the forum are sufficient to warrant jurisdiction depends on "the relationship among the defendant, the forum, and the litigation." (*Shaffer* v. *Heitner* (1977) 433 U.S. 186, 204 [53 L.Ed.2d 683, 698, 97 S.Ct. 2569].) That relationship "must be such that it is 'reasonable . . . to require the [defendant] to defend the particular suit which is brought there.'" (*World-Wide Volkswagen Corp.* v. *Woodson* (1980) 444 U.S. 286, 292 [62 L.Ed.2d 490, 498, 100 S.Ct. 559].)

One test is whether "defendant's conduct and connection with the forum State are such that he should reasonably anticipate being haled into court there." (*World-Wide Volkswagen Corp.* v. *Woodson, supra,* 444 U.S. at p. 297 [62 L.Ed.2d at p. 501].) Of course, in the modern age, "commercial transactions [may] touch two or more States and may involve parties separated by the full continent. With this increasing nationalization of commerce has come a great increase in the amount of business conducted by mail across state lines. At the same time modern transportation and communication have made it much less burdensome for a party sued to defend himself in a State where he engages in economic activity." (*McGee* v. *International Life Ins. Co.* (1957) 355 U.S. 220, 222-223 [2 L.Ed.2d 223, 226, 78 S.Ct. 199].)

Nevertheless, state court jurisdiction over nonresidents is not judged only by their expectations or the burden it would place upon them; due process restraints on the exercise of jurisdiction "are a consequence of territorial limitations on the power of the respective States." (*Hanson* v. *Denckla* (1958) 357 U.S. 235, 251 [2 L.Ed.2d 1283, 1296, 78 S.Ct. 1228].) Thus, "it is essential in each case that there be some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." (*Id.* at p. 253 [2 L.Ed.2d at p. 1298]; see also *Mansour* v. *Superior Court* (1995) 38 Cal.App.4th 1750, 1759 [46 Cal.Rptr.2d 191].) One way to invoke "benefits and protections" is to engage in economic activity in the forum state, provided that the income generated is not fortuitous or unforeseeable. (*Rice Growers Assn.* v. *First National Bank* (1985) 167 Cal.App.3d 559, 567 [214 Cal.Rptr. 468]; see also *McGee* v. *International Life Ins. Co., supra,* 355 U.S.

---

shifted to defendants to demonstrate that assumption of jurisdiction would be unreasonable. (*Ibid.*)

[3]I find nothing in *International Shoe* suggesting "public policy" of the forum state should play any role in the due process jurisdictional analysis.

at pp. 222-223 [2 L.Ed.2d at pp. 225-226]; *Furda* v. *Superior Court* (1984) 161 Cal.App.3d 418, 424 [207 Cal.Rptr. 646] [Although the rule was announced in a products case, there appears no reason why the test should be different for a nonresident marketing services where the individual purposefully entered into a contractual relationship in California and the relationship produced gross income as contemplated.].)[4]

There are no California cases precisely on point; but a physician's economic activity in the forum state, or lack thereof, seems to be the key to jurisdiction in this variety of litigation. In *Spokane Eye Clinic, Inc.* v. *Superior Court* (1976) 63 Cal.App.3d 548 [133 Cal.Rptr. 838], for example, the Court of Appeal concluded California had no jurisdiction over a Washington medical corporation that treated the plaintiff for glaucoma. After several years the corporation referred him to a San Francisco eye specialist, who performed surgery that resulted in a loss of vision. Plaintiff alleged his injury resulted in part from delay by the Washington doctors. None of the Washington corporation's physicians were licensed to practice medicine in California, and they received no referral fee. The clinic's doctors sent at least three patients per year to the San Francisco doctors for treatment; several of those physicians had previously studied glaucoma care in the San Francisco doctors' offices. The court quite properly concluded defendant corporation had performed no act in California and received no economic benefit from the referral.

Similarly, in *Wright* v. *Yackley* (9th Cir. 1972) 459 F.2d 287, plaintiff was treated with drugs by a defendant in South Dakota who gave her unlimited prescription refills. She moved to Idaho, but was unable to fill the prescription. She wrote the defendant who, without charge, furnished copies of her original prescription. She then claimed injury from use of the drugs.[5] The court explained the injury resulted from the original treatment and noted,

---

[4]Courts recognize that less extensive activity may support "limited" or "specific" jurisdiction, i.e., where defendant's contacts with the jurisdiction give rise to the cause of action asserted. (*Cornelison* v. *Chaney* (1976) 16 Cal.3d 143, 148 [127 Cal.Rptr. 352, 545 P.2d 264].) Jurisdiction exists over one who causes "effects in the state by an act or omission done elsewhere with respect to causes of action arising from the effects . . . unless the nature of the effects and of the individual's relationship to the state make exercise of jurisdiction unreasonable. [Citations.]" (*Secrest Machine Corp.* v. *Superior Court* (1983) 33 Cal.3d 664, 669 [190 Cal.Rptr. 175, 660 P.2d 399].)

[5]I have considered whether it might violate the law of California, and thus serve as a basis for jurisdiction, that physicians not licensed in this state prescribed drugs here for California patients. But Business and Professions Code section 4008 states, "the board may adopt regulations permitting the dispensing of drugs . . . pursuant to a prescription of a person licensed to prescribe in a state other than California . . . ." The regulations provide, "[a] pharmacist may furnish a drug or device pursuant to a written or oral order from a prescriber licensed in a state other than California in accordance with Business and Professions Code Section 4008." (Cal. Code Regs., tit. 16, § 1717, subd. (d).)

"[this] was not diagnosis and treatment by mail. It was simply confirmation of the old diagnosis and prescription." (*Id.* at p. 289.)

The court asserted the focus should be on the place where personal services are rendered, and tortious rendition is not a "portable tort . . . ." (*Wright* v. *Yackley*, *supra*, 459 F.2d at pp. 289-290.) It observed, "From the very nature of the average doctor's localized practice, there is no systematic or continuing effort on the part of the doctor to provide services which are to be felt in the forum state" and that a local doctor does not ordinarily engage in "voluntary, interstate economic activity." (*Id.* at p. 290.) The court also thought "[t]he traveling public would be ill served were the treatment of doctors confined to so much aspirin as would get the patient into the next state" (*ibid.*) and that the forum state's interest "is not that [its citizens] should be free from injury by out-of-state doctors, but rather that they should be able to secure adequate medical services to meet their needs wherever they may go." (*Id.* at p. 291; see also *Valley Wide Health Services* v. *Graham* (1987) 106 N.M. 71 [738 P.2d 1316] [A New Mexico resident treated at Colorado clinic; defendant doctor's single return call, confirming previous diagnosis, was held to be an insufficient contact.]; *Almeida* v. *Radovsky* (R.I. 1986) 506 A.2d 1373 [Plaintiff's decedent traveled from Rhode Island to Massachusetts for treatment for 15 years; no jurisdiction where physician's only "contact" was the execution of an agreement to accept payments from Rhode Island's Blue Shield plan and no evidence doctors derived any increase in business from Rhode Islanders or that the carrier referred its subscribers to out-of-state physicians.]; *Schwilm* v. *Holbrook* (3d Cir. 1981) 661 F.2d 12 [A West Virginia doctor misdiagnosed plaintiff's neck injury; the only contact with Pennsylvania was arranging plaintiff's transfer to a Pennsylvania hospital and sending medical records there.].)[6]

There is more here, however. *Kennedy* v. *Freeman* (10th Cir. 1990) 919 F.2d 126 is more apt factually. There a patient had a lesion removed in Oklahoma by a local physician. The doctor sent it to defendant in Texas, where he erroneously measured it, resulting in the wrong treatment and the spread of a malignant melanoma. The court said Oklahoma had personal

---

[6]In *Etra* v. *Matta* (1984) 61 N.Y.2d 455 [474 N.Y.S.2d 687, 463 N.E.2d 3], the court concluded New York's long-arm statute (applying where defendant " 'transacts . . . business' " or " 'contracts anywhere to supply goods or services in the state' ") did not reach a Massachusetts doctor who treated the decedent with an experimental drug in Massachusetts, referred him to a New York physician, and continued to consult and provide the experimental drug (the drug was available only from a clinical investigator), which ultimately caused the side effect that killed decedent. The court noted defendant did not act as the "treating physician" and was thus not conducting business in the state. It added that incidental provision of a drug, as part of a course of treatment rendered in another state, did not fall within contemplation of the statute. (463 N.E.2d. at pp. 4-5.)

jurisdiction over the Texas defendant: "In the context of doctor-patient litigation, special rules have evolved to ensure that personal jurisdiction is asserted over a doctor only when she has purposefully availed herself of the privileges of conducting activities within her patient's state. While a doctor's practice may be local, she may often treat out-of-state patients who seek her help. Thus, courts have had to fashion jurisdictional rules when doctors who have essentially local practices become involved in another state not as a result of their intention to do so but, rather, as a result of the action of their out-of-states patients. [Citations.] Courts have found jurisdiction over non-resident doctors where they purposefully directed their actions at plaintiffs' states. For example, where doctors or hospitals have intentionally solicited business from a state, courts have held jurisdiction over them to be proper in that state. [Citations.]" (*Id.* at p. 129.)

The court concluded due process was satisfied because defendant accepted the tissue sample from Oklahoma, sent his bill there, and rendered his diagnosis through the mail. (*Kennedy* v. *Freeman, supra,* 919 F.2d at p. 129; accord, *Bullion* v. *Gillespie* (5th Cir. 1990) 895 F.2d 213 [A Texas patient was referred to defendant, a California urologist, after reading her book. She was examined and treated in California and invited to participate in an experimental Food and Drug Administration treatment program, administered by her Texas physician. Defendant mailed her drugs, and plaintiff paid her for services and drugs.]; *McGee* v. *Riekhof* (D.Mont 1978) 442 F.Supp. 1276 [A Utah surgeon reattached a Montana resident's retina in Utah and told plaintiff's wife to call. During the second call, defendant said plaintiff could return to work. He did and suffered a retinal tear.].)

*Kennedy* also rejected the major argument against jurisdiction cited by the majority and the superior court in this case: "The district court reasoned that given [Oklahoma's] compelling interest in ensuring access to out-of-state, specialized medical care, jurisdiction should not lie in this case. However, when a doctor purposefully directs her activities at the forum state, that state has a greater interest in deterring medical malpractice against its residents. [Citations.] The district court's concerns are placed in their proper perspective when one considers that suits against doctors are always available in their home states. Thus, finding jurisdiction in this type of case will have only incremental deterrent effect on doctors who provide health care to citizens of foreign states. At any rate, our decision is consistent with the Supreme Court's observation that '[t]he Due Process Clause allows flexibility in ensuring that commercial actors are not effectively "judgment proof" for the consequences of obligations they voluntarily assume in other States.' " (*Kennedy* v. *Freeman, supra,* 919 F.2d at pp. 129-130.)

The present defendants' contacts with this state and this plaintiff were extensive. They actively consulted with her by telephone on numerous

occasions, monitored her condition, and arranged for her consumption of a variety of medications in California. Significantly, they billed plaintiff for these *new* services. The simple fact that treatment continued over the phone, for a price, convinces me defendant should have anticipated being haled into court in this state.

California jurisdiction in this case is not unreasonable under our long-arm statute. (See *Asahi Metal Industry Co.* v. *Superior Court* (1987) 480 U.S. 102, 113 [94 L.Ed.2d 92, 105, 107 S.Ct. 1026].) The burden on the doctors to defend in California, as opposed to Illinois, is not especially great in this age of electronic mail, video conferencing, videotape, and speedy air travel between major cities.[7] California does have a significant interest in protecting its residents from potentially harmful drugs and treatment rendered by those not licensed to practice here (although hardly the interest in an isolated incident of alleged malpractice by Illinois physicians that Illinois would). But the litigation could be resolved in this state, if Illinois is an unsatisfactory forum for some reason.

The majority is concerned that a finding of jurisdiction will encourage doctors to refuse to treat residents of other states or cause them to discontinue the care of patients returning to their home states. And these are somewhat troublesome notions, I agree. Doctors are notoriously litigation-sensitive, but they should not fear that this state would choose to retain the vast majority of cases of out-of-state origin. Under most circumstances the cases, local treatment, not solicited or followed up across state lines, will not result in a finding of jurisdiction.

Here, though, defendants went beyond the borders of Illinois and did more than merely counsel an erstwhile patient. They purposefully engaged in fee-generating activities in California. Assuming it has anything to do with the analysis, I see no fundamental substantive social policy of this state that would be subverted by finding jurisdiction on these facts. (*Kennedy* v. *Freeman, supra,* 919 F.2d at p. 129; but see *Howard* v. *Dooner Laboratories, Inc.* (1984) 211 Mont. 312 [688 P.2d 279].) And it is demeaning to the outstanding specialists, clinics, and hospitals around this country to suggest California patients would be given a couple of aspirin to get across the state line and no follow-up treatment were we to rule otherwise with respect to a few bad apples in the medical profession that cannot be discouraged in any other reasonable way apart from trial before a California jury.

In short, we should decline to adopt a *rule* to the effect that when out-of-state doctors elect to practice medicine in California by telephone and

---

[7]And removal to federal court under diversity rules appears available to defendants, if they wish.

mail, they will be immune from suit here. Why should one occupation be singled out for such special treatment under our long-arm statute? On the other hand, most similarly situated defendants, doctors and hospitals included, may proceed with a properly presented forum non conveniens motion.[8] (See Code Civ. Proc., § 418.10, subd. (d).) This state, after all, is not suffering from a lack of litigation.

I would reverse.

---

[8]I realize, of course, that the convenience of the forum is also a factor in the jurisdictional analysis "at least when . . . justification for the exercise of jurisdiction is not obvious." (*Cornelison* v. *Chaney, supra,* 16 Cal.3d at p. 150.) Here, with all due respect, prescribing medication for a fee in this state makes the exercise of jurisdiction sufficiently obvious to avoid resolving the jurisdictional issue on purely grounds of convenience. Another consideration is that the action might be barred in Illinois for some reason, in which case it would be quite an inconvenient forum for our California plaintiff. (See fn. 1, *ante.*) Moreover, the majority's finding that jurisdiction is lacking is the end of the lawsuit in California, while a determination that this state is merely an inconvenient forum would allow the court the option to abate, rather than dismiss, the proceeding. (Code Civ. Proc. § 410.30, subd. (a).)