Affirmed and Opinion filed March 11, 2004









Affirmed
and Opinion filed March 11, 2004.

 

 

In The

 

Fourteenth Court of Appeals

____________

 

NO. 14-03-00239-CV

____________

 

DOUGLAS K. BROCAIL, Appellant

 

V.

 

KYLE ANDERSON,
M.D., HENRY FORD HEALTH SYSTEM, WILLIAM CLAY FORD CENTER FOR ATHLETIC MEDICINE
A/K/A, D/B/A AND F/K/A CENTER FOR ATHLETIC MEDICINE, Appellees

 



 

On Appeal from the 125th
District Court

Harris County, Texas

Trial Court Cause No. 02-48741

 



 

O P I N I O N








In this appeal we must consider if a
Michigan doctor, by agreeing to prescribe post-operative physical therapy
through a Texas health care provider, had sufficient contacts with Texas to be
subject to personal jurisdiction in the courts of this State.  Douglas K. Brocail, formerly a pitcher for
the Detroit Tigers, sued appellees Kyle Anderson, M.D., Henry Ford Health
System, and the Center for Athletic Medicine,[1]
all medical care providers for the Detroit Tigers, alleging that he sustained
physical injury resulting from their medical negligence, gross negligence, and
fraud in failing to discover or treat a torn ligament in his elbow and in
failing to inform him of the full extent of his injury.  The trial court granted appellees= special
appearance and dismissed the claims against them.  On appeal, Brocail argues that appellees= contacts with
Texas were sufficient to confer personal jurisdiction over them because
Anderson, a doctor employed by the Henry Ford Health System and the Center for
Athletic Medicine, prescribed, approved, and monitored his post-surgery
physical therapy in Texas for approximately three months.  Finding that the physical therapy Anderson
prescribed was follow-up physical therapy for elbow surgeryCand that the
follow-up care was done in Texas at Brocail=s request and
without any monetary benefit to AndersonCwe affirm.

Factual
Background

Brocail was a professional baseball
pitcher for the Detroit Tigers, a major league baseball team.  The Tigers used the Henry Ford Health System
(HFHS), a Michigan-based health care provider and regional medical center, to
provide medical care for their players. 
In 2000, when Brocail injured his pitching elbow during baseball season,
the  Tigers referred him to Anderson, an
employee of HFHS and a team doctor for the Tigers.  Anderson practiced orthopedic surgery at
various HFHS locations in Michigan.

Anderson recommended arthroscopic surgery
for the elbow.  Before the surgery,
Anderson discussed with Brocail his treatment plan, outlining both the surgical
procedure and the contemplated rehabilitation of the elbow.  On September 22, 2000, Anderson performed the
surgery in Michigan, and after the surgery, he prescribed physical therapy for
Brocail.  However, baseball season was
over for the Tigers, and Brocail decided to return to his home in Texas.  At Brocail=s request,
Anderson agreed to prescribe physical therapy through a provider in Texas.








On October 4, 2000, Anderson faxed a
prescription for physical therapy for Brocail to HealthSouth, a health care
provider in Sugar Land, Texas.[2]  Because physical therapy requires a doctor=s approval,
HealthSouth faxed a proposed Acare plan@ from Texas to
Anderson for approval.  Anderson reviewed
the care plan and faxed his approval of the plan to Texas.  Thereafter, Brocail underwent physical
therapy at HealthSouth with a therapist named Wayne Brewer.  Brewer prepared progress reports and faxed
them from HealthSouth in Texas to Anderson in Michigan.  On October 23, 2001, Anderson wrote a second
prescription for additional physical therapy, including instructions  to begin a Atoss program@ at eight to ten
weeks after the surgery, and faxed it to HealthSouth.  Additionally, on October 30, 2000, he faxed
to HealthSouth a prescription for the application of a dynamic elbow
splint.  Approximately one month later,
on November 28, 2000, Brewer faxed a proposed treatment plan for Brocail that
included initiating Alight tossing@ in
mid-December.  Anderson reviewed the
plan, approved it, and faxed it back the next day.  In his affidavit, Brocail stated that he and
Anderson discussed Brocail=s physical therapy
by telephone, and Anderson also discussed Brocail=s treatment with
the physical therapy staff in Texas, but Anderson testified he did not recall
any such conversations.

The therapy continued until early January
2001, when Brocail was discharged from treatment.  On January 25, 2001, the Tigers sent a letter
to HealthSouth to explain that they had traded Brocail to the Houston Astros.  The letter directed that any medical bills
after December 20, 2000, should be directed to the Astros rather than the
Tigers.  








On September 20, 2002, Brocail brought
this lawsuit in Harris County, Texas, against appellees and other defendants,
including the Detroit Tigers.  He alleged
medical negligence, gross negligence, and fraud.  In response, Anderson and HFHS filed special
appearances.[3]  In support of his special appearance,
Anderson submitted an affidavit in which he testified to the following:  (1) he is licensed to practice medicine in
Michigan, but not Texas; (2) he practices medicine exclusively in Michigan; (3)
he has never practiced medicine in Texas; (4) he has never owned property or
had bank accounts in Texas; (5) he has not advertised or attempted to solicit
business in Texas; and (6) he is domiciled in Michigan.  HFHS=s corporate
witness submitted an affidavit in support of HFHS=s special
appearance, making similar claims regarding its lack of contacts with
Texas.  

In preparing a response to the special
appearance, Brocail conducted discovery on the jurisdictional issue, sending
written discovery and deposing Anderson and HFHS=s corporate
witness.  After a hearing, the trial
court sustained the special appearance and dismissed Brocail=s claims against
appellees.  Brocail requested findings of
fact and conclusions of law, but the trial court refused to make them.  This appeal followed.

Analysis

I.        Burden
of Proof

The plaintiff has the initial burden of
pleading sufficient allegations to bring the nonresident defendant within the
provisions of the Texas long‑arm statute. 
See BMC Software Belgium, N.V. v. Marchand, 83 S.W.3d 789, 793
(Tex. 2002); Hotel Partners v. KPMG Peat Marwick, 847 S.W.2d 630, 633
(Tex. App.CDallas 1993, writ denied).  A defendant challenging a Texas court=s personal
jurisdiction over it must negate all jurisdictional bases.  Marchand, 83 S.W.3d at 793; Nat=l Indus. Sand Ass=n v. Gibson, 897 S.W.2d 769,
772 (Tex. 1995).  

II.       Standards
of Review








Whether a court has personal jurisdiction over a defendant is
a question of law.  Am. Type Culture
Collection, Inc. v. Coleman, 83 S.W.3d 801, 805B06 (Tex. 2002); Marchand, 83
S.W.3d at 794.  But in resolving this
question of law, a trial court must frequently resolve questions of fact.  Coleman, 83 S.W.3d at 806; Marchand,
83 S.W.3d at 794.  On appeal, the trial
court=s determination to grant or deny a
special appearance is subject to de novo review, but we may be called upon to
review the trial court=s resolution of a factual dispute.  Coleman, 83 S.W.3d at 806.  When the trial court does not issue findings
of fact, we presume that the trial court resolved all factual disputes in favor
of its judgment.  Id.  However, when the appellate record includes
the reporter=s and clerk=s records, these implied findings are
not conclusive and may be challenged for legal and factual sufficiency.  Marchand, 83 S.W.3d at 795.

III.      State
and Federal Jurisdictional Requirements

Texas courts may exercise jurisdiction over a nonresident if
two conditions are satisfied: (1) the Texas long‑arm statute authorizes
the exercise of personal jurisdiction; and (2) the exercise of jurisdiction is
consistent with federal and state constitutional guarantees of due process. See
Schlobohm v. Schapiro, 784 S.W.2d 355, 356 (Tex. 1990).  The Texas long‑arm statute
authorizes Texas courts to exercise jurisdiction over a nonresident defendant
who Adoes business@ in the state,
including by the commission of a tort, in whole or in part.  Tex.
Civ. Prac. & Rem. Code ' 17.042.  The Texas Supreme Court has interpreted the broad language of
the Texas long arm statute to extend Texas courts= personal jurisdiction Aas far as the federal constitutional
requirements of due process will permit.@ 
Marchand, 83 S.W.3d at 795 (citing U‑Anchor Adver., Inc.
v. Burt, 553 S.W.2d 760, 762 (Tex. 1977) (noting that Athe reach of [the Texas long-arm
statute] is limited only by the United States Constitution@)). 
As a practical matter, therefore, we need consider only whether it is
consistent with federal constitutional requirements of due process for Texas
courts to assert personal jurisdiction over Greene.  See Guardian Royal Exch. Assurance Ltd. v.
English China Clays, P.L.C., 815 S.W.2d 223, 226 (Tex. 1991).








Federal constitutional requirements of due process limit a
state=s power to assert personal
jurisdiction over a nonresident defendant. 
Id.  Personal jurisdiction
over a nonresident defendant is constitutional when two conditions are met: (1)
the defendant has established minimum contacts with the forum state; and (2)
the exercise of jurisdiction comports with traditional notions of fair play and
substantial justice.  Marchand, 83
S.W.3d at 795 (citing Int=l Shoe Co. v. Washington, 326 U.S. 310 (1945)).

Under the minimum contacts analysis, we must determine
whether the nonresident defendant has purposefully availed itself of the
privilege of conducting activities within the forum state, thus invoking the
benefits and protections of the state=s laws.  See Burger King Corp. v. Rudzewicz,
471 U.S. 462, 474B75 (1985); Guardian Royal, 815 S.W.2d at 226.  A nonresident defendant that purposefully
avails itself of the privileges and benefits of conducting business in the
forum state has sufficient contacts with the forum to confer personal
jurisdiction on the court.  See Burger
King, 471 U.S. at 474B76; Marchand, 83 S.W.3d at 795.  The purposeful availment requirement is a
threshold that protects nonresidents; it ensures that the nonresident=s connections derive from its own
purposeful conduct, and not from random, fortuitous, or attenuated contacts
with the forum, or worse, from another=s acts.  Marchand, 83 S.W.3d at 795;
Guardian Royal, 815 S.W.2d at 226B27. 
The nonresident must take some action or engage in some conduct creating
a Asubstantial connection@ with the forum state.  Guardian Royal, 815 S.W.2d at 226.

Foreseeability of being haled into the
forum=s courts is an
important consideration in deciding whether the nonresident defendant has
purposefully established minimum contacts with the forum state.  Guardian Royal, 815 S.W.2d at
227.  It is not an independent component
of the minimum contacts analysis, but is implicit in the test.  If a Asubstantial
connection@ exists between the nonresident and Texas
arising from the nonresident=s purposeful
conduct directed towards Texas, he should be able to foresee being subject to
Texas courts.  Id.  Individuals must have fair warning that a
particular activity may subject them to the jurisdiction of a foreign
sovereign.  Burger King, 471 U.S.
at 472; Guardian Royal, 815 S.W.2d at 226; see also World‑Wide
Volkswagen Corp. v. Woodson, 444 U.S. 286, 297 (1980) (holding that the
foreseeability critical to due process Ais that the
defendant=s conduct and connection with the forum
State are such that he should reasonably anticipate being haled into court
there@).








Jurisdiction must also comport with traditional notions of
fair play and substantial justice.  Burger King, 471 U.S. at 476; Guardian
Royal, 815 S.W.2d at 228.  The
following factors, when appropriate, should be considered: (1) the burden on
the defendant; (2) the interests of the forum state in adjudicating the
dispute; (3) the plaintiff's interest in obtaining convenient and effective
relief; (4) the interstate judicial system's interest in obtaining the most
efficient resolution of controversies; and (5) the shared interest of the
several states in furthering fundamental substantive social policies.  World-Wide Volkswagen, 444 U.S. at
292; Guardian Royal, 815 S.W.2d at 231.

Texas courts may exercise two types of jurisdiction based on
a nonresident=s contacts with the state.  If the controversy arises out of or relates
to the defendant=s contacts with Texas, the court may invoke specific
jurisdiction over the nonresident defendant.  See Helicopteros Nacionales de Colombia,
S.A. v. Hall, 466 U.S. 408 (1984); Marchand, 83 S.W.3d at 796.  If the cause of action does not arise out of
the contacts, Texas courts may exercise personal jurisdiction over a
nonresident defendant who maintains continuous and systematic contacts with the
state.  Helicopteros, 466 U.S. at
414; Marchand, 83 S.W.3d at 796. 
Here, only specific jurisdiction is alleged.

Specific jurisdiction is established if the defendant=s alleged liability arises from or is
related to an activity conducted within the forum.  Marchand, 83 S.W.3d at 746.  The defendant=s activities must have been
purposefully directed toward the forum state.  See Guardian Royal, 815 S.W.2d at
228.  When specific jurisdiction is
asserted, the minimum contacts analysis focuses on the relationship among the
defendant, the forum, and the litigation. 
See id.  

IV.      Did
Appellees Demonstrate They Lack Minimum Contacts to Support the Assertion of
Personal Jurisdiction in Texas?








Brocail alleges Anderson purposefully
directed his activities to Texas.  He
claims Anderson did this by (1) referring Brocail to a physical therapy
provider in Texas, (2) faxing prescriptions for initial and continued treatment
to Texas, (3) receiving and reviewing information on Brocail=s progress from
Texas, and (4) making and forwarding additional diagnoses and prescriptions for
treatment to Texas.  Brocail emphasizes
that HealthSouth could not administer physical therapy to Brocail without a
doctor=s approval.  Additionally, Brocail contends that, while he
was undergoing treatment in Texas, appellees never fully disclosed to him the
extent or nature of his injuries, and that he relied on this to his detriment
in Texas.  He claims Anderson could have
foreseen that Brocail would experience the brunt of any physical and economic
injury arising from his contacts in Texas. 
And, because Anderson=s contacts were
made in the course and scope of his employment, Brocail argues that they are
also attributed to HFHS.[4]  

In response, Anderson argues that he, as a
team doctor for the Detroit Tigers, performed surgery on Brocail in Michigan
and prescribed rehabilitative treatment for him in Michigan.  The post-surgical rehabilitation that took
place in Texas was only in the nature of routine follow-up care, which Brocail
chose to undergo in Texas.  Because any
contacts with Texas were merely fortuitous, Anderson contends he cannot be
subject to personal jurisdiction here.

A.      The
AOut-of-State
Doctor@ Cases








In considering whether to subject an
out-of-state doctor to personal jurisdiction within a state, courts have
fashioned special rules that they apply in conjunction with the general
jurisdiction analysis just reviewed.  See,
e.g., Matthew Ryan Booker, Commentary, Physicians, Malpractice, and
State Lines: A Guide to Personal Jurisdiction in Medical Malpractice Lawsuits,
20 J. Legal Med. 385, 393B403 (1999); Joelle
Lee A. Nicol, Note, Given an Opportunity to Redefine the Gray Area of AMinimum Contacts,@ the Court in
Prince v. Urban Chose to Remain in the Dark, 25 W. St. U. L. Rev. 313, 330B67 (1998);  Kennedy v. Freeman, 919 F.2d 126 (10th
Cir. 1990).  In support of his position,
Anderson directs us to a line of Aout-of-state
doctor@ cases represented
by the seminal case of Wright v. Yackley, 459 F.2d 287 (9th Cir.
1972).  Yackley, a South Dakota doctor,
prescribed medication for Wright, who was then a resident of South Dakota.  Wright moved to Idaho and, at Wright=s request, Yackley
forwarded copies of the original prescriptions so that Wright=s Idaho pharmacist
would continue to refill them.  Id.
at 288.  Wright later brought a
malpractice action against Yackley for injury arising from the use of the
medication.  The Wright court
rejected the notion of a Aportable tort@ that moves with
the patient.  Id. at 290.  Instead, the court reasoned that a doctor=s focus is not on
a place, but on a person:

In the case of
personal services focus must be on the place where the services are rendered,
since this is the place of the receiver=s (here the
patient=s) need.  The need is personal and the services
rendered are in response to the dimensions of that personal need.  They are directed to no place but to the
needy person herself.  It is in the very
nature of such services that their consequences will be felt wherever the
person may choose to go.  However, the
idea that tortious rendition of such services is a portable tort which can be
deemed to have been committed wherever the consequences foreseeably were felt
is wholly inconsistent with the public interest in having services of this sort
generally available.  Medical services in
particular should not be proscribed by the doctor=s concerns as to
where the patient may carry the consequences of his treatment and in what
distant lands he may be called upon to defend it.  The traveling public would be ill served were
the treatment of local doctors confined to so much aspirin as would get the
patient into the next state.  The scope
of medical treatment should be defined by the patient=s needs, as
diagnosed by the doctor, rather than by geography.








Id. at 289B90.  The Wright court=s reasoningCthat a physician=s services are
personal and not directed at a specific locationChas been followed
by numerous courts, including several in Texas. 
See, e.g., Townsend v. Univ. Hosp., 83 S.W.3d 913, 921 (Tex. App.CTexarkana 2002,
pet. denied); Vogel v. Bellows-Blakely, 1999 WL 270330, *3 (Tex. App.CDallas 1999, no
pet) (not designated for publication); Oden v. Marrs, 880 S.W.2d 451,
457 (Tex. App.CTexarkana 1994, no writ); Clark v.
Noyes, 871 S.W.2d 508, 514 (Tex. App.CDallas 1994, no
writ).     

Wright has also factored
significantly in case law in which a nonresident doctor renders primary
medical treatment to a patient in the doctor=s home state, but
later provides follow-up care to the patient out-of-state.  See, e.g., Sanders v. Buch,
938 F. Supp. 532 (W.D. Ark. 1996); Vance v. Molina, 28 P.3d 570 (Okla.
2001); Prince v. Urban, 57 Cal. Rptr. 2d 181 (Cal. App. 1996); Hume
v. Durwood Med. Clinic, Inc., 318 S.E.2d 119 (S.C. App. 1984).  We think these cases, involving situations
similar to this case, provide appropriate guidance for our resolution of the
jurisdictional question here.








In Sanders v. Buch, Buch operated
on Sanders= ankle following a work-related injury in
Dallas, Texas, and continued to treat Sanders for his injuries in his office
and in various hospitals in Dallas for about a year.  938 F. Supp. at 534.  Sanders then moved to Arkansas, where his
treatment continued with home health services provided by an Arkansas medical
center.  The medical center identified
Buch as Sander=s doctor, and called him for physician=s orders, which
Buch later confirmed and signed.  For
over two weeks, Sanders was provided treatment pursuant to Buch=s orders, the
orders were discussed over the phone by Buch and his employees, and Buch signed
various forms confirming his orders.  Id. at 534.           Sanders later brought a malpractice action premised on a
series of acts and omissions by Buch and others that occurred in Arkansas.  In holding that Buch was not subject to
personal jurisdiction in Arkansas, the Sanders court closely examined Wright
and concluded that Buch did not purposefully initiate activity within the forum
state, and did nothing to invoke the benefits and protections of Arkansas.  Id. at 537B38.  As the court explained: AThe doctor-patient
relationship was established in Texas, Sanders resided in Texas at the time the
relationship was established, all visits and hospitalizations occurred in
Texas, the request for home health care originated in Texas, and the >prescription= for home health
care was written in Texas.@  Id. at 538.  The court acknowledged that the treatment
took place in the forum state, but the court held that this was not enough, and
that the doctor had not done Aanything more than
confirm his orders regarding the care, respond to inquiries regarding the
course of treatment, and receive reports regarding the same from Arkansas.@  Id.

In the more recent case of Vance v.
Molina, Molina performed in Texas two gastric segmentation surgeries on
Vance, an Oklahoma resident.  After each
surgery, Molina communicated by telephone several times with Vance=s Oklahoma
physicians regarding her condition and treatment.  The Oklahoma Supreme Court held that personal
jurisdiction could not be exercised over Molina.  28 P.3d at 572.  The court examined Wright and other
similar cases and concluded that A[m]ost of those
cases have held that a doctor who provides primary treatment to a nonresident
in his home state and follow up advice to the patient and her local doctors in
her home state can=t be sued in the patient=s home state.@  Id. at 573.  The court found that the Texas doctor=s discussions were
Aancillary@ and Aincidental@ to the surgeries
the doctor performed in Texas, concluding that specialty care involves
follow-up care, and that a doctor has an ethical obligation to render follow-up
care.  Id. at 574.

In Prince v. Urban, Prince, a
California resident who suffered from migraines, was referred to Urban, an
Illinois headache specialist, for treatment. 
57 Cal. Rptr. 2d at 182.  After
receiving treatment in Illinois, Prince returned to California with
prescriptions for various medications. 
While there, she had numerous telephone conferences with Urban, for
which she was charged, and when her medication ran out, Urban or an associate
had additional medication mailed to her in California, and sometimes called
prescriptions directly to California pharmacies for her.  The medications caused Prince to become
confused and dysfunctional, and she required hospitalization at a California
detoxification facility.  Prince then
sued for malpractice.   Id.








In affirming the lower court=s finding that it
lacked personal jurisdiction, the Prince court expressly based its
conclusion on the Wright court=s reasoning that a
physician=s services are personal and are directed
to a specific patient, not a location.  Id.  The court held that A[f]ollow up
consultation ancillary to the examination and treatment made by the
out-of-state patient, or arrangements for a patient to continue with medication
prescribed by that doctor do not reach the minimum contacts necessary for the
satisfaction of due process.@  Id. at 184.  In so holding, the court noted that the Wright
court Abased its decision
on the nature of medical services rather than just declaring that certain
services fell on one side of the line . . . or the other.@  Id. at 185.

The outcome in Hume v. Durwood Medical
Clinic differs in its analysis from that in Sanders, Vance,
and Prince, but reaches the same result. 
The Hume court found that the follow-up care provided by the
out-of-state doctor was sufficient to invoke personal jurisdiction, but held
that its exercise would offend fair play and substantial justice.  See 318 S.E.2d at 122.  Hume, a resident of South Carolina, was
referred by his doctor to two North Carolina specialists, who treated him over
a period of years.  The specialists knew
Hume was from South Carolina, they collaborated with Hume=s South Carolina
doctor regarding Hume=s treatment by advising the doctor and
furnishing him with medical records, and one of the specialists wrote a letter
to Hume in South Carolina furnishing medial advice.  After Hume had a heart attack and died, his
administratrix brought a malpractice action in South Carolina against the
doctors and their clinic.  Id.








The court, after reviewing the case law,
determined that the invocation of personal jurisdiction over a nonresident
doctor would be appropriate in those cases in which the doctor Aengaged in a
course of treatment by mail or his conduct involved a breach of a duty to
provide follow-up care in the forum state.@  Id. at 122.  The Hume court held that the
administratrix had shown, Aby the barest
facts,@ that the
specialists had engaged in a course of treatment of Hume in North Carolina, and
to satisfy their obligation to provide follow-up care to Hume, they had Aattempted by mail
and telephone to provide some treatment to him in South Carolina.@  Id. 
Nevertheless, the Hume court held that exercising jurisdiction
over the specialists would offend due process in light of the Atenuous@ relationship
between the specialists and the forum, explaining that they Awere merely
fulfilling their professional responsibilities to provide medical services to a
patient in need, and should not by so doing automatically subject themselves to
the jurisdiction of the courts of this State.@  Id. at 123.  The court also found that the exercise of
jurisdiction would be unreasonable in light of the countervailing interests in
providing a forum for South Carolina citizens to redress injuries and the
chilling effect that the exercise of jurisdiction would have on the
availability of medical services in South Carolina.  Id. 
Finally, the court also noted that the plaintiff failed to demonstrate
that being required to litigate in North Carolina would impose any burden on
her.  Id.

B.      This
Case is Similar to These AOut-of-State
Doctor@ Cases

With these cases as a backdrop, we now
turn to our analysis of Anderson=s contacts.
Anderson was a team doctor for the Detroit Tigers.  He practiced sports medicine and orthopedic
surgery at various locations in Michigan. 
He did not travel with the team, and when he treated Detroit Tigers
baseball players, he did so in Michigan. 
Anderson diagnosed Brocail=s injury and
performed surgery on him in Michigan. 
Following the surgery, Anderson prescribed physical therapy for Brocail
and wrote the prescription for rehabilitation in Michigan.  There was also some evidence that the therapy
may have started informally in Michigan. 


Anderson did not direct Brocail to go to
Texas for the rehabilitation; Brocail unilaterally decided to return to his
home in Texas.  In fact, although Brocail
disputed it, Anderson testified that he was not sure he knew where Brocail
lived.  Anderson also testified that he
preferred that the post-surgical physical therapy take place in Michigan:  AIdeally it would
be done here where I can contact people, but we don=t refuse treatment
because somebody wants to go home.@  And, while it is undisputed that Anderson
faxed the rehabilitation prescription to HealthSouth, it is unclear from the
record how Brocail came to use HealthSouth=s facility in the
first place.[5]  There was no evidence that Anderson told
Brocail to obtain treatment from HealthSouth.








Once Brocail began his therapy in Houston,
Anderson approved the care plans HealthSouth=s therapist
prepared, reviewed some progress reports, ordered light tossing and a dynamic
elbow splint, and twice prescribed the continuation of the therapy originally
prescribed in Michigan for a total of three months of therapy.  Anderson did not bill Brocail for these
services, and Brocail made no payments to Anderson for them.  

These facts are practically
indistinguishable from those in Sanders. 
There the court found that personal jurisdiction did not exist over the
out-of-state doctor because his only contacts were confirming his orders for
home health care with the provider, responding to inquiries regarding the
course of treatment, and receiving reports regarding the treatment from the
forum state.  See 938 F. Supp. at
537B38.  Brocail argues that additional contacts
present hereCprescribing initiation of Alight tossing,@ and prescribing a
dynamic elbow splintCgo beyond merely Aconfirming@ orders.  We agree that these activities make this a
closer case than Sanders, but we do not think they are sufficient to
cross the constitutional threshold separating no jurisdiction from
jurisdiction.[6]  We find these contacts more in the nature of
continuing the follow-up treatment. 
Accordingly, we find this case analogous to Sanders, Vance,
and Prince than it is to the authorities Brocail relies upon.[7]









We also distinguish this case from Hume,
in which the court found the specialists= contacts
constituted a course of treatment in the specialists= home state and
the follow-up care amounted to treatment by mail and telephone.  See 318 S.E.2d at 122.  There, however, the specialists treated Hume
in North Carolina over a period of years, collaborated with Hume=s doctor in South
Carolina, and furnished medical advice by letter to Hume.  Id. at 120B21.  These contacts are more significant than
those hereCin both duration and quality.  Anderson did 
not directly provide continuing primary care to Brocail once Brocail
returned to Texas; he merely authorized and affirmed the course of
rehabilitative treatment he prescribed. 
If the facts of Hume constituted the Abarest facts@ creating only a Atenuous@ relationship to
the forum, see id. at 122B23, the contacts
hereCwhich are even
lessCcannot create even
a tenuous relationship with Texas.  They
are, at their best, fortuitous and attenuated andCworseCarise from another=s acts.  See Marchand, 83 S.W.3d at 785.[8]


Brocail argues that jurisdiction over
Anderson is proper because he has alleged the commission of torts in whole or
in part in TexasCmedical negligence, fraud, and fraudulent
concealment based on the failure to fully disclose the true extent of his
injuries.  But Brocail is complaining
about a physical injury based on a course of treatment.  Any tort occurred in the exercise of medical
judgment in prescribing a course of physical therapy in Michigan, not from the
communication of that prescription to HealthSouth.  See Wright, 459 F.2d at 288 (A[if the doctor]
was guilty of malpractice, it was through acts of diagnosis and prescription
performed in [his home state]@); see also
Kennedy v. Advantage Health Plan, Inc., 2001 WL 25755, at *4 n.6 (Tex. App.CHouston [14th
Dist.] 2001, no pet.) (not designated for publication) (AThe wrongful act,
if any, was appellees= decision, which was made in Louisiana,
not the communication of that decision to Dr. Campbell in Texas.@). 








Brocail=s attempt to
establish jurisdiction is not improved by his claim that appellees never fully
disclosed to him the nature and extent of his injuries while he was in Texas,
and that he relied on this nondisclosure in Texas.  ABy its very
nature, failure to disclose demonstrates that a party did not have contacts
with the forum state.@  Anderson
v. Bechtle, 2001 WL 930205, at *2 (Tex. App.CHouston [1st
Dist.] Aug. 16, 2001, no pet.) (not designated for publication).  Indeed, Ait is difficult to
see how a failure to act could meet the purposeful availment requirement needed
to establish personal jurisdiction.@  Id.; see also Vogel, 1999 WL
270330 at *6 (holding that a failure to act does not constitute an affirmative
act required for the assertion of specific jurisdiction).

CONCLUSION

We acknowledge that this is a close
case.  However, applying the special
rules formulated for doctor-patient litigation when a doctor having a local
practice has contacts with a patient in another state, the state of the record
supports no jurisdiction.  The great bulk
of the treatment falls squarely under the follow-up care cases.  Two events arguably increase the chances of
asserting jurisdiction: prescribing the elbow splint and the initiation of Alight tossing.@  The question then becomes whether those two
facts by themselves throw the balance toward asserting jurisdiction.  We conclude that they do not.  Thus, after carefully considering the merits
of Brocail=s claims, we hold that Anderson=s contacts with
Texas, when viewed in their entirety, are not sufficient to constitute
purposeful availment of the benefits and protections of practicing medicine in
Texas.  

The judgment of the trial court is
affirmed.

 

 

/s/      Wanda McKee Fowler

Justice

 

Judgment
rendered and filed March 11, 2004.

Panel
consists of Justices Yates, Hudson, and Fowler.











[1]  Other
defendants also were sued but they are not part of this appeal.





[2]  Anderson
signed the physical therapy prescription as AReferring
Physician.@  Brocail also
identified Anderson as the referring physician on HealthSouth=s patient medical history form.  However, the record is unclear whether
Anderson specifically referred Brocail to HealthSouth.





[3]  A
representative of HFHS testified that the defendant/appellee identified as AWilliam Clay Ford Center for Athletic Medicine@ is not an independent legal entity, but is simply a
d/b/a of HFHS.





[4]  Brocail also challenges the legal
and factual sufficiency of any implied finding of fact that: (1) Anderson did
not purposefully direct his activities to Texas; (2) Anderson was not an
employee of HFHS acting within the course and scope of his employment when he
treated Brocail in Texas; (3) Anderson or HFHS personnel did not talk by
telephone to Brocail=s therapist, Wayne Brewer or
HealthSouth personnel in Texas; (4) HealthSouth did not send Anderson progress
reports from Texas and that Anderson reviewed them; (5) Anderson did not send
to Texas his approval of care plans, treatment regimens, and treatment plans he
received from HealthSouth; (6) HealthSouth did not need Anderson=s or another doctor=s approval to administer plaintiff=s treatment in Texas; (7) Anderson
did not render treatment in Texas; (8) Anderson did not render any diagnosis in
Texas; or (9) Anderson did not refer Brocail to HealthSouth in Texas.  





[5]  In his
affidavit, Brocail states that Anderson knew he lived in Texas, and therefore
Anderson Aprescribed physical therapy for me at his direction to
be conducted in Houston, Texas@ and A[t]he physical therapy was conducted at a HealthSouth
facility located in Sugar Land, Texas.@  However, Brocail does not specifically state
that Anderson referred him to HealthSouth. 






[6]  Additionally,
Brocail argues that Sanders is distinguishable because Sanders moved to
the forum state after receiving primary treatment from Buch, whereas here,
Brocail lived in Texas at all relevant times and merely returned home.  However, we do not find this fact to be
extremely significant to our analysis, given the totality of the circumstances
present here, especially since Brocail was in Detroit part of the year as a
pitcher for the Detroit Tigers.





[7]  Brocail relies primarily on four
cases he contends contain contacts similar to those alleged here:  Bullion v. Gillespie, 895 F.2d 213
(5th Cir. 1990); Kennedy v. Freeman, 919 F.2d 126 (10th Cir. 1990); Gonzales
v. Chandel, 13 F. Supp. 2d 1197 (D. Kan. 1998); and McGee v. Riekhof,
442 F. Supp. 1276 (D. Mont. 1978). 
However, we find the cases we have discussed factually closer to this
case than those Brocail relies upon. 
Moreover, we disagree with the result in McGee v. Riekhof.  There, a Utah doctor performed surgery to
repair the retina of the plaintiff, a Montana resident, in Utah.  See 442 F. Supp. at 1277.  At some point thereafter, the doctor advised
the plaintiff=s wife by telephone that the
plaintiff could return to work.  When he
did so, however, serious complications resulted, and thereafter the plaintiff
sued the Utah doctor in Michigan.  The McGee
court found personal jurisdiction on the basis of that single telephone call,
holding that it constituted a Anew diagnosis@ rendered telephonically in Montana.  Id. at 1278.  We find the reasoning unpersuasive.





[8]  Brocail also argues that Texas has
a legitimate interest in providing a convenient and effective forum for its
residents, but this argument goes to the second prong of the due process
analysisCwhether the exercise of jurisdiction
over the nonresident comports with traditional notions of fair play and
substantial justiceCwhich we do not reach.