April MENDEL, Appellant

v.

Eric WILLIAMS, M.D., Albert Einstein Medical Center, Albert Einstein Healthcare Network, In Its Own Right and d/b/a Albert Einstein Medical Center and d/b/a Einstein Regional Orthopaedic Specialists and d/b/a Einstein Orthopaedic Associates, Einstein Regional Orthopaedic Special-

ists a/k/a Einstein Regional Orthopaedic Associates, Einstein Practice Plan, Inc., Andrew Beaver, M.D., Vilas Saldanha, M.D., Robert Ocasio, M.D., Underwood Memorial Hospital, Appellees.

April Mendel, Appellant

v.

Eric Williams, M.D., Albert Einstein Medical Center, Albert Einstein Healthcare Network, In Its Own Right and d/b/a Albert Einstein Medical Center and d/b/a Einstein Regional Orthopaedic Specialists and d/b/a Einstein Orthopaedic Associates, Einstein Regional Orthopaedic Specialists a/k/a Einstein Regional Orthopaedic Associates, Einstein Practice Plan, Inc., Andrew Beaver, M.D., Vilas Saldanha, M.D., Robert Ocasio, M.D., Underwood Memorial Hospital, Appellees.

Superior Court of Pennsylvania.

Argued June 5, 2012.

Filed Aug. 20, 2012.

Barbara Axelrod, Philadelphia, for appellant.

Charles W. Craven Philadelphia, for Ocasio, appellee.

John P. Cirrincione, Mount Laurel, New Jersey, for Underwood, appellee.

BEFORE: STEVENS, P.J., LAZARUS, J., and COLVILLE, J.*

OPINION BY LAZARUS, J.

April Mendel appeals from the March 17, 2011 and March 21, 2011 orders of the Court of Common Pleas of Philadelphia County, sustaining the preliminary objections filed by Underwood Memorial Hospital ("Underwood") and Doctor Robert Ocasio, M.D. asserting lack of personal jurisdiction in Pennsylvania. Mendel's appeal requires us to determine whether a Pennsylvania court may assert personal jurisdiction over an out-of-state doctor, or corporate healthcare provider, in a medical malpractice action by a Pennsylvania resident who receives negligent treatment in a foreign jurisdiction. For the following reasons, we affirm.

## I. Factual History

On July 31, 2008, Eric Williams, M.D. and Andrew Beaver, M.D. performed L3–S1 laminectomy surgery on Mendel's spine at the Albert Einstein Medical Center ("Einstein") in Philadelphia, Pennsylvania. Doctor Williams and Doctor Beaver are licensed to practice medicine in Pennsylvania; both maintain a medical office and regular place of business at Einstein.

Mendel left Einstein on August 4, 2008, and returned to her home in Turnersville, New Jersey. The following week, on August 11, 2008, Mendel experienced drainage from her surgical wound and contracted a fever. Mendel contacted a member of Doctor William's staff, later identified as Connie Massaro, who suggested that she

---

* Retired Senior Judge assigned to the Superior Court.

go to an emergency room. Mendel went to Underwood in Woodbury, New Jersey later that day.

Underwood emergency room physicians confirmed that Mendel had a wound infection in the laminectomy incision with purulent drainage. The emergency room physicians contacted Doctor Williams, who agreed to accept Mendel at Einstein, but stated that there would not be an available bed until the following day. In the interim, Mendel was admitted to the internal medicine service of Doctor Ocasio at Underwood.

During the course of the night, Mendel complained of worsening pain in her legs. Doctor Ocasio and other Underwood physicians approved increasingly strong pain medication, but failed to diagnose and treat the epidural abscess that was compressing Mendel's spine. Mendel further alleges that Doctor Ocasio did not make any mention of Mendel's pain in her discharge summary, describing her condition as "stable," and that he certified her transfer to Einstein without warning Doctor Williams of her worsening condition.

Mendel was transported by ambulance to Einstein the following morning, on August 12, 2008. Doctor Williams performed additional surgery later that day at Einstein to correct the infected wound. The surgery revealed that the abscess extended to the spinal cord and that Mendel suffered paralysis below the waist. Doctors subsequently discharged Mendel to a rehabilitation center on August 29, 2008. Despite rehabilitation efforts, Mendel has not regained movement or feeling below the waist.

## II. Procedural History

Mendel initiated the instant action by writ of summons in the Court of Common Pleas of Philadelphia County on July 28, 2010 against Underwood, Doctor Ocasio,

Einstein and the treating physicians at Einstein. Mendel alleged that Doctor Ocasio and Underwood's failure in New Jersey to timely diagnose and treat her injury, or to warn doctors at Einstein of her worsening condition, caused her paraplegia in Pennsylvania.

Mendel filed a complaint on August 6, 2010. Doctor Ocasio filed preliminary objections to the complaint on August 13, 2010, alleging lack of personal jurisdiction in Pennsylvania. Doctor Ocasio stated that Mendel's cause of action against him arose in New Jersey, noting that his only interaction with Mendel was at Underwood, his medical practice is limited to New Jersey and he is a New Jersey resident. Doctor Ocasio further averred that he did not have sufficient contacts with Pennsylvania to establish general or specific jurisdiction in the Commonwealth. On March 17, 2011, the trial court entered an order dismissing Mendel's action against Doctor Ocasio for lack of personal jurisdiction.

Underwood filed preliminary objections to Mendel's complaint on September 14, 2011, also alleging Pennsylvania lacked personal jurisdiction. Underwood stated that Pennsylvania did not have general personal jurisdiction because Underwood was not served in Pennsylvania, is not a domiciliary of Pennsylvania and did not consent to suit in Pennsylvania. Additionally, Underwood claimed that Pennsylvania did not have specific personal jurisdiction because the cause of action did not arise out of Underwood's activities within the Commonwealth. On March 21, 2011, the trial court entered its order dismissing the action against Underwood for lack of personal jurisdiction.

Mendel filed a timely appeal from the trial court's March 17, 2011 and March 21, 2011 orders and timely complied with the

trial court's order to file a statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(b). Mendel raises four issues for our review:[1]

I. Did the lower court err in dismissing Ms. Mendel's claim against [Underwood] for alleged lack of general personal jurisdiction, where she presented evidence that the Hospital has purposefully directed its activities at residents of this jurisdiction, and its business activities here are continuous and substantial?

II. Did the lower court err in dismissing Ms. Mendel's claims against [Underwood] for alleged lack of specific personal jurisdiction under 42 Pa.C.S.[A.] § 5322(a)(4) (regarding conduct outside this Commonwealth which causes tortious injury in this Commonwealth), where (a) Ms. Mendel alleged that the negligent medical care she received at Underwood had continued at the hospital in Philadelphia, PA to which Underwood had transferred her by ambulance, and that these negligent acts and omissions had combined to bring about the permanent paralysis she suffered **in Pennsylvania;** and (b) Ms. Mendel also presented evidence that Underwood has purposefully and continuously directed its activities to residents of this jurisdiction?

III. Did the lower court err in dismissing Ms. Mendel's claim against Dr. Ocasio for alleged lack of specific jurisdiction, where (a) Ms. Mendel alleged that the negligent medical care Dr. Ocasio provided at Underwood had continued at the hospital in Philadelphia, PA to which he had her transferred by ambulance; he had negligently failed to advise the medical staff in PA that Ms. Mendel was complaining of worsening pain for which he had prescribed increasingly strong narcotics, and the negligent acts and omissions of the New Jersey and PA physicians and hospitals had combined to bring about the permanent paralysis she suffered in Pennsylvania; and (b) Ms. Mendel also presented evidence that Dr. Ocasio has purposefully and continuously maintained substantial contacts with this jurisdiction?

IV. Did the trial court err in signing an Order which appeared to sustain Underwood's preliminary objection to venue, where the trial court repeatedly stated in its Opinion only that it had sustained the preliminary objections to jurisdiction and said nothing about venue, and this medical malpractice action was brought to enforce a joint and several liability of New Jersey and Philadelphia, Pennsylvania medical defendants, and it is undisputed that the latter were properly sued here in Philadelphia?

Brief of Appellant, at 5–6 (emphasis in original).

### III. Analysis

#### A. Personal Jurisdiction

Mendel avers that the trial court erred in granting Doctor Ocasio and Underwood's preliminary objections as to personal jurisdiction in Pennsylvania. Our standard of review of a trial court's order granting preliminary objections challenging personal jurisdiction is as follows:

[W]hen deciding a motion to dismiss for lack of personal jurisdiction the court must consider the evidence in the light most favorable to the non-moving party. This Court will reverse the trial court's decision regarding preliminary objections only where there has been an error of law or an abuse of discretion. Once the moving party supports its objections to personal jurisdiction, the burden of proving personal jurisdiction is upon the

---

1. We have renumbered Mendel's issues for ease of disposition.

party asserting it. Courts must resolve the question of personal jurisdiction based on the circumstances of each particular case.

*Schiavone v. Aveta*, 41 A.3d 861, 865 (Pa.Super.2012) (citation omitted).

▮▮▮ The Due Process Clause of the Fourteenth Amendment to the United States Constitution limits the authority of a state to exercise *in personam* jurisdiction over non-resident defendants. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 471–72, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985). The extent to which jurisdiction is proscribed by the Due Process Clause is dependent upon the nature and quality of the defendant's contacts with the forum state. *See id.* at 474–76, 105 S.Ct. 2174; *Kubik v. Letteri*, 532 Pa. 10, 614 A.2d 1110, 1114 (1992). Where a defendant "has established no meaningful contacts, ties or relations" with the forum, the Due Process Clause prohibits the exercise of personal jurisdiction. *Burger King, supra* at 472, 105 S.Ct. 2174. However, where a defendant has "purposefully directed" his activities at the residents of the forum, he is presumed to have "fair warning" that he may be called to suit there. *Id.*

▮▮▮ A defendant's activities in the forum State may give rise to either specific jurisdiction or general jurisdiction. *See Kubik, supra* at 1113. "Specific jurisdiction ... depends on an 'affiliatio[n] between the forum and the underlying controversy,' principally, activity or an occurrence that takes place in the forum State and is therefore subject to the State's regulation." *Goodyear Dunlop Tires Operations, S.A. v. Brown*, — U.S. —, 131 S.Ct. 2846, 2851, 180 L.Ed.2d 796 (2011). Because due process may permit specific jurisdiction based solely on "single or occasional" acts purposefully directed at the forum, it is narrow in scope, limiting a cause of action to the extent that it "arises out of or relates to" the very activity that establishes jurisdiction. *See id.* at 2851, 2854; *Burger King, supra* at 472, 105 S.Ct. 2174.

▮▮▮ Alternatively, general jurisdiction involves "circumstances, or a course of conduct, from which it is proper to infer an intention to benefit from[,] and thus an intention to submit to[,] the laws of the forum State[.]" *J. McIntyre Machinery, Ltd. v. Nicastro*, — U.S. —, 131 S.Ct. 2780, 2787, 180 L.Ed.2d 765 (2011). "For an individual, the paradigm forum for the exercise of general jurisdiction is the individual's domicile; for a corporation, it is an equivalent place, one in which the corporation is fairly regarded as at home." *Goodyear, supra* at 2853–54. Thus, general jurisdiction may be exercised against foreign corporations "when their affiliations with the [forum] State are so 'continuous and systematic' as to render them essentially at home [there]." *Goodyear, supra* at 2851 (quoting *International Shoe Co. v. Washington*, 326 U.S. 310, 317, 66 S.Ct. 154, 90 L.Ed. 95 (1945)). In contrast to specific jurisdiction, a state that has general jurisdiction may adjudicate "both matters that originate within the State and those based on activities and events elsewhere." *J. McIntyre, supra* at 2787.

### 1. General Jurisdiction over Underwood

▮▮▮ General jurisdiction in Pennsylvania is governed by section 5301 of the Judicial Code. Section 5301(a) authorizes jurisdiction over a foreign corporation that carries on a "continuous and systematic part of its general business within this Commonwealth." 42 Pa.C.S.A. § 5301(a)(2)(iii). When jurisdiction over a defendant is based on section 5301(a), any cause of action may be asserted against the defendant, whether or not it arises from the defendant's conduct in Pennsyl-

vania. 42 Pa.C.S.A. 5301(b). However, the propriety of such exercise must be tested against the Due Process Clause.[2] *See Haas v. Four Seasons Campground, Inc.,* 952 A.2d 688, 692 (Pa.Super.2008) (specific and general jurisdiction both subject to limitations of Due Process Clause).

"[T]here is no statutory framework by which courts may determine whether a non-resident corporate defendant has conducted a 'continuous and systematic' part of its business in [this] Commonwealth[.]" *Derman v. Wilair Services, Inc.,* 404 Pa.Super. 136, 590 A.2d 317, 323 (1991) (citation omitted). Nevertheless, we may draw several principles from both the United States Supreme Court's jurisprudence on general jurisdiction, and our own cases interpreting section 5301(a)(2)(iii). *See id.* For instance, the purchasing of products from the forum State, entering into a limited number of contracts in the forum State and allowing a third party to use a corporate logo in the forum State have each been held to fall short of the "continuous and systematic" type of business activity necessary to establish general jurisdiction. *See Helicopteros Nacionales de Colombia, S.A. v. Hall,* 466 U.S. 408, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984) (no general jurisdiction in Texas over Colombian corporation that purchased majority of helicopters and parts from Texas company and that had pilots trained there); *Fidelity Leasing, Inc. v. Limestone County Bd. of Educ.,* 758 A.2d 1207 (Pa.Super.2000) (contract with non-resident party alone cannot establish sufficient minimum contacts for general jurisdiction); *Skinner v.*

*Flymo, Inc.,* 351 Pa.Super. 234, 505 A.2d 616 (1986) (permitting use of corporate logo by third party does not establish general jurisdiction).

The United States Supreme Court's decision in *Perkins v. Benguet Consol. Mining Co.,* 342 U.S. 437, 72 S.Ct. 413, 96 L.Ed. 485 (1952) "remains '[t]he textbook case of general jurisdiction appropriately exercised over a foreign corporation that has not consented to suit in the forum.'" *Goodyear, supra* at 2856 (quoting *Donahue v. Far Eastern Air Transport Corp.,* 652 F.2d 1032, 1037 (D.C.Cir.1981)). In *Perkins,* a Philippine mining corporation was sued in Ohio for a cause of action unrelated to its business activities in Ohio. *Perkins, supra* at 438–39, 72 S.Ct. 413. In upholding general jurisdiction, the Supreme Court noted that the president of the company, who was also the general manager and principal stockholder, had returned to his home in Ohio where he maintained an office on behalf of the company. *Id.* at 447–48, 72 S.Ct. 413. Regarding the president's Ohio office, the Court explained:

He kept there office files of the company. He carried on there correspondence relating to the business of the company and to its employees. He drew and distributed there salary checks on behalf of the company, both in his own favor as president and in favor of two company secretaries who worked there with him. He used and maintained ... two active bank accounts carrying substantial bal-

---

**2.** The language of section 5301(a)(2)(iii) is substantially identical to the United States Supreme Court's jurisprudence regarding general jurisdiction over foreign corporations that have not consented to suit in the forum. Thus, we interpret the statute to require only the minimum business activity necessary to establish general jurisdiction under the Due Process Clause. *Compare* 42

Pa.C.S.A. § 5301(a)(2)(iii) (authorizing general jurisdiction over foreign corporation based on "[t]he carrying on of a continuous and systematic part of its general business within this Commonwealth"), *with Goodyear, supra* (permitting general jurisdiction over foreign corporation that carries on "continuous and systematic" part of its general business in forum State).

ances of company funds.... Several directors' meetings were held at his office or home in [Ohio]. From that office he supervised policies dealing with the rehabilitation of the corporation's properties in the Philippines and he dispatched funds to cover purchases of machinery for such rehabilitation.

*Id.* at 448, 72 S.Ct. 413. Given these extensive operations, the Court concluded that the corporation's president "carried on in Ohio a continuous and systematic supervision" of certain aspects of the company's business, such that the exercise of general jurisdiction over the corporation in Ohio would not violate due process. *Id.*

More recently, in *Goodyear, supra,* the Supreme Court revisited the application of general jurisdiction in a case involving foreign subsidiary corporations of the Goodyear Tire and Rubber Company.[3] The plaintiffs alleged that the subsidiaries—Goodyear Luxembourg, Goodyear Turkey and Goodyear France—manufactured defective tires that caused the deaths of two North Carolina residents in Paris, France. Plaintiffs argued that jurisdiction in North Carolina was proper because the subsidiaries manufactured Goodyear tires, a small percentage of which were distributed in North Carolina by other Goodyear USA affiliates. *Id.* at 2852.

The Supreme Court rejected the plaintiffs' "stream-of-commerce" argument as a basis for general jurisdiction, finding that the defendants were "in no sense at home in North Carolina." *Id.* at 2857. Unlike the defendant in *Perkins,* the Goodyear subsidiaries "[had] no place of business, employees, or bank accounts in North Carolina" and had not engaged in any regular or substantial business activity there. *Id.* at 2852, 2857. Thus, the Court held that

"North Carolina is not a forum in which it would be permissible to subject [the Goodyear subsidiaries] to general jurisdiction." *Id.* at 2857.

In *McCall v. Formu–3 Intern., Inc.,* 437 Pa.Super. 575, 650 A.2d 903 (1994), this Court applied the Supreme Court's "continuous and systematic" contacts test to determine whether a foreign corporate defendant that manufactured a product which caused harm to a Pennsylvania resident in Pennsylvania was subject to general jurisdiction under section 5301(a)(2)(iii). The plaintiff in *McCall* cited several examples of the corporate defendant's contacts with Pennsylvania, including that it had entered into a joint venture with a Pennsylvania company, that it "engaged in a series of on-going contacts, meetings, and opportunities to exchange information with several Pennsylvania companies" and that its allegedly defective product had entered the Pennsylvania stream of commerce. *Id.* at 906. These contacts notwithstanding, we concluded that the requirement for general jurisdiction was not satisfied. Significantly, the defendant did not purposefully distribute its product in Pennsylvania, maintained no office here, was not qualified to do business here, had no real or personal property here and did not maintain a bank account here. *Id.* at 907.

With these principles in mind, we turn to the activities of Underwood in Pennsylvania. Mendel claims that Underwood has "continuous and substantial" activities within this Commonwealth based on its business associations with Thomas Jefferson University Hospital ("Jefferson"), which is located in Philadelphia, Pennsylvania. *See* Brief of Appellant, at 53. Specifically, Mendel argues that Underwood

---

**3.** The Goodyear Tire and Rubber Company, or Goodyear USA, was also named as a defendant in the lawsuit. Goodyear USA did not

contest that North Carolina had personal jurisdiction over it. *Goodyear, supra* at 2852.

has represented to the public that it is affiliated with the Jefferson health system by using the Jefferson logo on signage and stationery, and that it has promoted itself on its website as a member of the Jefferson network. Mendel also points out that Underwood entered into contracts with Jefferson, including a patient transfer agreement whereby Underwood would retain responsibility for patients *en route* to Jefferson.

While Mendel has alleged certain facts which show business activity by Underwood in Pennsylvania, we do not agree that this activity was so "continuous or systematic" as to permit general jurisdiction in Pennsylvania. Unlike the defendant in *Perkins,* which conducted the major operations of its business in Ohio, Underwood cannot be said to operate a substantial portion of its business in Pennsylvania. *See Perkins, supra.* Underwood maintains no real property in Pennsylvania, has no offices in Pennsylvania, and does not provide any services in Pennsylvania. *See Goodyear, supra; McCall, supra.*

Mendel's arguments that Underwood's business agreements with Jefferson were sufficient to justify general jurisdiction despite its limited presence in Pennsylvania are unavailing. As in *McCall,* the business agreements between Underwood and Jefferson did not evidence a "continuous and systematic" doing of business in this Commonwealth because the agreements did not contemplate any requirement of business activity by Underwood in Pennsylvania. *See McCall, supra.* Rather, these agreements provided that Underwood would accept and treat Jefferson patients in its New Jersey facility. *See id.; see also Fidelity Leasing, supra* (contract alone does not establish minimum contacts with forum).

Additionally, we find nothing significant about Underwood's use of Jefferson's logo that would establish general jurisdiction in Pennsylvania. Underwood's alleged use of the logo at its New Jersey facility, on office stationery and in a non-interactive website, is not activity which could be said to occur substantially in Pennsylvania. Even if Underwood had used Jefferson's logo predominantly in Pennsylvania, it does not follow that such activity would necessarily provide a basis general jurisdiction. This argument was implicitly rejected by the Supreme Court in *Goodyear* when it held that North Carolina lacked general jurisdiction over foreign defendants who shared the corporate name of their in-state parent company and manufactured products bearing the parent company's corporate logo. *See Goodyear, supra; see also Skinner, supra* (company that permitted third party to use corporate logo that ended up on product in Pennsylvania not subject to general jurisdiction in Pennsylvania).

Therefore, we conclude that Underwood did not carry on "a continuous and systematic part of its general business within this Commonwealth" as to establish general jurisdiction in Pennsylvania. *See* 42 Pa. C.S.A. § 5301(a)(2)(iii); *Perkins, supra.*

## 2. Specific Jurisdiction over Underwood and Doctor Ocasio

A foreign defendant who does not have sufficient contacts with Pennsylvania to establish general jurisdiction may nevertheless be subject to specific jurisdiction in Pennsylvania pursuant to the Pennsylvania Long–Arm Statute, 42 Pa.C.S.A. § 5322 (Bases of personal jurisdiction over persons outside this Commonwealth). Section 5322(a) contains ten paragraphs that specify particular types of contact with Pennsylvania deemed sufficient to warrant the exercise of specific jurisdiction. *Scoggins v.*

*Scoggins,* 382 Pa.Super. 507, 555 A.2d 1314, 1318 (1989); 42 Pa.C.S.A. § 5322(a). In addition, section 5322(b) operates as a "catchall," providing that jurisdiction may be exercised over persons who do not fall within the express provisions of section 5322(a) to the fullest extent permitted by the Due Process Clause of the United States Constitution. *Scoggins, supra;* 42 Pa.C.S.A. § 5322(b). Regardless, if a defendant's activities in Pennsylvania only give rise to jurisdiction under section 5322(a) or (b), the plaintiff's cause of action is limited to those activities which formed the basis of jurisdiction. *See* 42 Pa.C.S.A. § 5322(c).

Once it is determined that jurisdiction is authorized by the Long–Arm Statute, the party seeking relief must demonstrate that the exercise of jurisdiction conforms with the Due Process Clause. *See Derman, supra* at *320; see also Schiavone, supra* at 866 (two requirements necessary for specific jurisdiction in Pennsylvania: (1) jurisdiction must be authorized by state Long–Arm Statute; and (2) jurisdiction must comport with constitutional principles of due process). Whether specific jurisdiction is proper under the Due Process Clause requires a two-part analysis: first, the plaintiff must demonstrate that the defendant purposefully established minimum contacts with the forum state; and second, the maintenance of the suit must not offend "traditional notions of fair play and substantial justice." *See Schiavone, supra* at 869 (quoting *Burger King, supra* at 474, 105 S.Ct. 2174).

A defendant purposefully establishes minimum contacts with the forum state when its contacts are:

such that the defendant could reasonably anticipate being called to defend itself in the forum.... Random, fortui-

tous, and attenuated contacts cannot reasonably notify a party that it may be called to defend itself in a foreign forum and, thus, cannot support the exercise of personal jurisdiction. That is, the defendant must have purposefully directed its activities to the forum and conducted itself in a manner indicating that it has availed itself of the forum's privileges and benefits such that it should be subjected to the forum state's laws and regulations.

*Aventis Pasteur, Inc. v. Alden Surgical Co., Inc.,* 848 A.2d 996, 1000 (Pa.Super.2004).

If the defendant has purposefully established minimum contacts in the forum State, these contacts must be considered on a case-by-case basis to determine whether they "are such as to make it reasonable and fair to require him to conduct his defense in the state." *Kubik, supra* at 1114; *see J.C. Snavely & Sons, Inc. v. Springland Assoc.,* 411 Pa.Super. 1, 600 A.2d 972, 974 (1991).

Factors to be considered include (1) the burden on the defendant, (2) the forum state's interest in adjudicating the dispute, (3) the plaintiff's interest in obtaining convenient and effective relief, (4) the interstate judicial system's interest in obtaining the most efficient resolution of controversies and (5) the shared interest of the several states in furthering fundamental substantive social policies.

*Kubik, supra* at 1114 (citing *Burger King, supra* at 478, 105 S.Ct. 2174).

**a. Pennsylvania Long–Arm Statute**

Mendel asserts that specific jurisdiction over Underwood and Doctor Ocasio is proper in Pennsylvania under section 5322(a)(4) of the Long–Arm Statute.[4] That section provides:

which permits specific jurisdiction to the full-

4. This Court has noted that section 5322(b),

**(a) General rule.**—A tribunal of this Commonwealth may exercise personal jurisdiction over a person ... who acts directly or by an agent, as to a cause of action or other matter arising from such person:

\*     \*     \*

(4) Causing harm or tortious injury in this Commonwealth by an act or omission outside this Commonwealth.

42 Pa.C.S.A. § 5322(a)(4).

Mendel claims that Underwood and Doctor Ocasio meet the statutory requirements of section 5322(a)(4) because their failure to diagnose and treat her spinal cord injury in New Jersey, or to send Einstein a report of her medical condition after she had been transferred to Pennsylvania caused her paralysis in Pennsylvania. Mendel's attempt to frame her paralysis as a harm or injury caused in Pennsylvania is facially appealing, but ultimately unpersuasive.

█ The appellate courts of this Commonwealth have not directly addressed the issue of whether medical treatment by a doctor or corporate medical care provider outside this Commonwealth, which later results in injury to a Pennsylvania resident inside this Commonwealth, may give rise to specific jurisdiction under section 5322(a)(4). However, in *McAndrew v. Burnett*, 374 F.Supp. 460 (M.D.Pa.1974) and *Kurtz v. Draur*, 434 F.Supp. 958 (E.D.Pa.1977), the United States District Courts for the Middle and Eastern Districts of Pennsylvania did consider a similar question in applying the predecessor to the current Long–Arm Statute.[5] Thus, we will look to these cases for guidance.[6]

est extent allowed by the Due Process Clause, is broader in scope than section 5322(a), and effectively subsumes the express provisions of section 5322(a). *See Scoggins, supra* at 1319; *Gaboury v. Gaboury*, 988 A.2d 672, 679 n. 5 (Pa.Super.2009). Thus, where the plaintiff has alleged jurisdiction under both section 5322(a) and 5322(b), this Court has declined to conduct a separate analysis of section 5322(a), and has instead addressed only whether the requirements of Due Process were satisfied. *See e.g. Scoggins, supra.* However, in cases in which the plaintiff has argued Long–Arm jurisdiction solely under section 5322(a), our Courts have engaged in separate analysis of the Long–Arm Statute and the requirements of Due Process. *See e.g. Kubik, supra; Schiavone, supra* (analyzing whether requirements of section 5322(a)(3) were satisfied in addition to requirements of due process). Here, Mendel argues that jurisdiction is proper only under section 5322(a)(4), and does not specifically state that section 5322(b) also applies. Because Mendel has limited her argument to section 5322(a)(4), and because satisfaction of the express conditions of section 5322(a) is helpful in a determination of whether the requirements of Due Process are met, we will consider whether section 5322(a)(4) confers personal jurisdiction in the instant case. *See Kubik, supra.*

5. *McAndrew* and *Kurtz* each involved the exercise of specific personal jurisdiction pursuant to 42 Pa.C.S.A. § 8305, which provided that:

Any nonresident of this Commonwealth who, acting outside of this Commonwealth, individually, ... or through an agent, servant or employee, shall have caused any harm within this Commonwealth ... shall be subject to service of process in any civil action or proceeding instituted in the courts of this Commonwealth arising out of or by reason of any such conduct.

Act of November 15, 1972, P.L. 1063, No. 271, 42 Pa.C.S.A. § 8301 et seq. Section 8305 was repealed in 1976 and replaced by section 5322. *See* Act of July 9, 1976, P.L. 586, No. 142, § 2.

6. Although the courts of this Commonwealth are not bound by the reasoning of the federal courts inferior to the United States Supreme Court or to the decisions of other states' courts on matters of Pennsylvania law, we may nevertheless look to these cases as persuasive authority. *See Branham, supra* at 1103; *In re Stevenson*, —— Pa. ——, 40 A.3d 1212 (2012); *Office of Disciplinary Counsel v.*

In *McAndrew*, a patient's widow brought suit against a New York doctor who negligently left a hemostat in the patient's abdominal cavity during surgery. The patient subsequently moved to Pennsylvania, where the hemostat was discovered. Despite undergoing surgery to remove the device, the patient did not survive. In rejecting personal jurisdiction under the Pennsylvania Long–Arm Statute, the Middle District Court determined that the act of leaving the hemostat in the patient did not cause any harm within this Commonwealth, as required by the Long–Arm Statute. *See McAndrew, supra* at 463. Rather, the harm was caused in New York when the hemostat was allegedly left in the patient's body. *See McAndrew, supra* at 463. The Court further opined:

> That a continuing injury was at some point suffered by the [patient] in Pennsylvania, and that the existence of the hemostat in his body was discovered here, does not in my view constitute the sort of harm which may serve as a basis for extraterritorial service under 42 [Pa. C.S.A.] § 8305.

*Id.*

In *Kurtz*, a patient sought treatment at a Nebraska hospital for a heart condition. The complaint alleged that the treating physician failed to properly diagnose the condition or to provide adequate follow-up care. The patient later moved to Pennsylvania where he suffered "residual harm" from the alleged negligent treatment. Like the Middle District in *McAndrew*, the Eastern District Court reasoned that section 8305 "was not designed to take cognizance of the residual effects of out-of-state injuries" resulting from medical treatment, and that "[t]he 'harm' which [the treating physician was] alleged to have caused, occurred in Nebraska." *Id.* at 961–62.

We agree with the reasoning of the Middle and Eastern District Courts in *McAndrew* and *Kurtz*, and conclude that in the instant action, the alleged negligence of Underwood and Doctor Ocasio did not "[cause] harm or tortious injury in this Commonwealth" as contemplated by section 5322(a)(4).[7] *See McAndrew, supra; Kurtz, supra.* The mere fact that Mendel's paralysis was discovered in Pennsylvania, or that it manifested in Pennsylvania, does not necessarily mean that it was *caused* in Pennsylvania.

Accepting Mendel's factual averments as true, Underwood and Doctor Ocasio contributed to Mendel's paralysis by delaying treatment of her spinal abscess—either through their failure to treat her injury themselves, or by failing to notify doctors at Einstein of her status. This delay began when Mendel was a patient at Under-

---

Marcone, 579 Pa. 1, 855 A.2d 654, 664 n. 12 (2004).

7. Section 8305 contained two notable differences from section 5322(a)(4). First, section 8305 applied only to individuals, not corporations. *See B.J. McAdams, Inc. v. Boggs,* 426 F.Supp. 1091, 1096 (E.D.Pa.1977). Second, section 8503 only applied to an affirmative act, and did specifically include an "omission." *See* note 5, *supra; see also Rogers v. Rogers,* 295 Pa.Super. 160, 441 A.2d 398, 400 (1982) (noting potential effects of changes in Pennsylvania Long–Arm Statute); *Davis v. Davis,* 452 F.Supp. 44 (E.D.Pa.1978) (holding that section 8305 did not confer jurisdiction over defendant who failed to act, but that defendant's omissions would likely be covered by section 5322, which had been adopted but was not yet in effect). Nevertheless, *Kurtz* and *McAndrew* are still persuasive here because the basis for the decisions did not hinge on whether the defendant was a person within the meaning of the statute or that the alleged act was within the meaning of the statute; rather the district courts determined that section 8305 did not apply because the alleged harm did not arise in Pennsylvania—a necessary requirement to both sections 8305 and 5322(a)(4).

wood's New Jersey facility. Thus, it follows that any harm resulting from the delay was also caused in New Jersey. That the harm may have continued in Pennsylvania and was ultimately discovered in Pennsylvania does not alter the fact that it originated in New Jersey. *See McAndrew, supra* at 463 (rejecting notion that injury which continued, or was discovered, in Pennsylvania is caused in Pennsylvania for purposes of Long–Arm jurisdiction).

Further, we reject Mendel's attempts to parse out her treatment such that Underwood and Doctor Ocasio's failure to notify Einstein of her condition after she was transferred to Pennsylvania could give rise to a distinct "omission" in the state of New Jersey that caused "harm or tortious injury" in Pennsylvania. Rather, the failure to inform evidenced only a continuation of a single course of negligent conduct that originated in New Jersey; namely, Underwood and Doctor Ocasio's failure to diagnose and treat Mendel's condition. *See Kurtz, supra* and *McAndrew, supra; see also Prince v. Urban*, 49 Cal.App.4th 1056, 57 Cal.Rptr.2d 181 (1996) (rejecting notion that follow-up treatment in patient's home state constitutes a "new" diagnosis that could give rise to personal jurisdiction). Therefore, we conclude that section 5322(a)(4) of the Long–Arm Statute does not provide a basis for specific personal jurisdiction over Underwood or Doctor Ocasio.

#### b. Due Process

■ Even if section 5322(a) did encompass the activities of Underwood and Doctor Ocasio, specific jurisdiction in Pennsylvania would nevertheless be prohibited because Underwood and Doctor Ocasio do not have sufficient minimum contacts with Pennsylvania to satisfy the requirements of Due Process. *See Derman, supra.*

Courts have generally been reluctant to extend specific personal jurisdiction to out-of-state medical providers for causing injury to Pennsylvania patients, even though the effects of the doctors' negligence may be felt in Pennsylvania. *See, e.g., Lebkuecher v. Loquasto*, 255 Pa.Super. 608, 389 A.2d 143 (1978) (no Pennsylvania jurisdiction over New Jersey physician who rendered services in New Jersey to Pennsylvania resident even though physician was listed in Pennsylvania phone book); *Walters v. St. Elizabeth Hosp. Medical Center*, 543 F.Supp. 559 (W.D.Pa.1982) (no Pennsylvania jurisdiction over Ohio hospital that treated Pennsylvania residents); *Gallant v. Trustees of Columbia University in City of New York*, 111 F.Supp.2d 638 (E.D.Pa.2000) (Pennsylvania lacked jurisdiction over New York defendant that provided allegedly negligent treatment in New York despite follow-up telephone and mail communication with plaintiffs in Pennsylvania).

The majority of other jurisdictions have applied a similar approach to personal jurisdiction over out-of-state doctors in medical malpractice actions. *See, e.g., Coggeshall v. Reproductive Endocrine Associates of Charlotte*, 376 S.C. 12, 655 S.E.2d 476, 480 (2007) (holding no personal jurisdiction in South Carolina over out-of-state doctor because injury occurred in forum where medical treatment was given, not where patient resides); *Harris v. Omelon*, 985 A.2d 1103 (D.C.2009) (holding District of Columbia lacks jurisdiction over Virginia doctor who prescribed medication to patient that resulted in injury in D.C.). These decisions further a public policy, articulated by the Ninth Circuit Court of Appeals in *Wright v. Yackley*, 459 F.2d 287

(9th Cir.1972),[8] designed to encourage proper medical treatment:

> In the case of personal services[,] focus must be on the place where the services are rendered, since this is the place of the receiver's (here the patient's) need. The need is personal and the services rendered are in response to the dimensions of that personal need. They are directed to no place but to the needy person herself. It is in the very nature of such services that their consequences will be felt wherever the person may choose to go. However, the idea that tortious rendition of such services is a portable tort which can be deemed to have been committed wherever the consequences foreseeably were felt is wholly inconsistent with the public interest in having services of this sort generally available. **Medical services in particular should not be proscribed by the doctor's concerns as to where the patient may carry the consequences of his treatment and in what distant lands he may be called upon to defend it. The traveling public would be ill served were the treatment of local doctors confined to so much aspirin as would get the patient into the next state.**

*Id.* at 289–90 (emphasis added).

The policy in *Wright* assumes that medical practices tend to be "localized" within a single state. *See id.* at 290. Thus, where the practice involves interstate activity, either through marketing or purposeful and continued treatment of foreign patients, courts are more likely to uphold specific jurisdiction over the out-of-state physician. *See, e.g., Bullion v. Gillespie,* 895 F.2d 213 (5th Cir.1990) (holding California urologist who authored nationally distributed book that attracted a Texas patient, later placed patient on mailing list for urologist's newsletter and kept in regular contact with patient's Texas doctor could be called to court in Texas for recommending new medication to patient that caused injury); *Kennedy v. Freeman,* 919 F.2d 126 (10th Cir.1990) (holding Oklahoma had jurisdiction over Texas doctor who specialized in analyzing tissue samples that were sent through mail because he "purposefully direct[ed] his actions [to Oklahoma]" by accepting the sample from there and sending back a report).

In *Prince, supra,* the California Fourth District Court of Appeal considered the limits of personal jurisdiction over an out-of-state doctor who causes injury to an in-state patient. There, a California patient was referred to an Illinois headache specialist who treated the patient in Illinois for migraines and prescribed her various medications. After returning to California, the patient maintained telephone contact with the specialist and the specialist continued to prescribe and mail additional medication to the patient. The patient subsequently had an adverse reaction to the medications in California and filed a malpractice suit against the specialist there.

The Court of Appeal acknowledged that "the case [was] a close one" for personal jurisdiction, but concluded that "the balance [was] tipped in the direction of no jurisdiction" because of the personal na-

---

**8.** In *Wright,* an Idaho resident wrote to her former doctor in South Dakota to send a confirmation of her prescription so that she could refill her medication. The resident was subsequently injured by the medication and sued the doctor in federal district court in Idaho. The Ninth Circuit affirmed the district court's dismissal for lack of personal jurisdiction, reasoning that the malpractice was not an act performed in Idaho, but was simply a confirmation of what the doctor had previously done in South Dakota. *See Wright, supra* at 289.

ture of the services rendered. *Id.* at 1059, 57 Cal.Rptr.2d 181. The court held, "where . . . the out-of-state doctor's contact with the forum state consists of nothing more than telephonic follow-up [care] on services rendered in the doctor's own state, it is unreasonable for the patient's home state to exercise personal jurisdiction over the physician." *Id.* at 1059, 57 Cal.Rptr.2d 181.

In support, the court noted three factors in particular which tended to negate jurisdiction. First, the specialist did not engage in any "systematic or continuing effort" to provide services in California. Although the specialist did offer "follow-up care" to the patient in California, and the patient suffered injury in California, the court concluded that the injury could not be said to have been caused in California as the treatment was merely a continuation of one set of services which originated in Illinois. *See id.* at 1066, 57 Cal. Rptr.2d 181 ("it is utterly unrealistic to attempt to divide . . . the follow-up [care] from the initial out-of-state rendition of services"). Second, "the services rendered by [the specialist] were not 'grounded' in any relationship with California" because the patient sought the specialist on her own through a referral. *Id.* at 1064, 57 Cal.Rptr.2d 181. Finally, recognizing the policy considerations articulated by the Ninth Circuit in *Wright, supra,* the court concluded that limiting jurisdiction would further the interests of California by encouraging out-of-state doctors to provide appropriate medical treatment to California residents, especially "where specialized medical treatment is needed and California citizens must travel out of state to find it." *See id.* at 1064, 57 Cal. Rptr.2d 181.

In contrast to the "follow-up care" described in *Prince, Walsh v. Chez,* 418 F.Supp.2d 781 (W.D.Pa.2006) involved circumstances where a doctor's continued treatment of a foreign patient could be described as independent conduct in the patient's forum state. In *Walsh,* an Illinois doctor who specialized in autism agreed to treat a child from Pennsylvania who had been diagnosed with the disorder. After conducting an initial evaluation at his Illinois office, the doctor developed a treatment plan using the steroid prednisone. Initially, the doctor recommended that the child take a daily dosage of prednisone for the first four weeks, followed by a twice-weekly dosage. However, after the child returned to Pennsylvania, the doctor altered the treatment, authorizing a daily dosage for the first seven weeks. The child subsequently developed respiratory problems and died. The parents alleged that the change in treatment caused the child's death and filed suit against the doctor in Pennsylvania.

In upholding specific personal jurisdiction against the doctor in Pennsylvania, the District Court noted that the plaintiff's malpractice action centered on the allegedly negligent altering of the steroid treatment to include an additional three weeks of daily prednisone dosages. This change, in turn, was authorized while the patient was in Pennsylvania and constituted a distinct course of treatment from that prescribed while the patient was in Illinois. Thus, the court explained that this was not a case where a doctor simply improperly diagnosed a foreign patient in the doctor's home state and the result continued in Pennsylvania; rather, the harm was caused in Pennsylvania, where the treatment was altered.[9] Further, it was rea-

---

**9.** *Walsh* applied section 5322(b) of the Pennsylvania Long–Arm Statute. Thus, it considered only whether specific jurisdiction in

Pennsylvania met the constitutional requirements of due process and did not directly

sonable for the doctor to anticipate that this change could cause him to have to defend himself in Pennsylvania because he had agreed to continue monitoring the child and to render medical advice after he had returned to Pennsylvania. The court concluded: "Coupling the changed diagnosis with the agreement to monitor [the child's] treatment makes it clear that this Court has jurisdiction over [the doctor]." *Id.* at 788.

The facts of the instant case do not present any of the special characteristics of a doctor-patient relationship that would justify extending jurisdiction in Pennsylvania to Underwood or Doctor Ocasio. Like the specialist in *Prince,* Underwood and Doctor Ocasio did not promote their practice through national marketing, did not solicit Mendel as a patient and did not purposefully treat patients in Pennsylvania. *See Prince, supra.* Additionally, unlike *Walsh,* Underwood and Doctor Ocasio did not maintain any contact with Mendel after she had returned to Pennsylvania such that they could be said to have committed a negligent act here or purposefully directed their activities here. To the contrary, Mendel's complaint centers on Underwood and Doctor Ocasio's *failure* to act after she returned to Pennsylvania.

Nor does the fact that Mendel's injury continued in Pennsylvania or was discovered in Pennsylvania allow for an inference that Underwood or Doctor Ocasio caused harm here. As we have established above, to the extent that Mendel was caused harm by Underwood and Doctor Ocasio, the harm occurred in New Jersey where the negligence originated, not

in Pennsylvania where the negligence was discovered. *See Prince, supra* (tortious act occurred in Illinois where patient was originally treated despite fact that doctor provided follow up treatment in California); *Wright, supra* (fact that doctor allowed patient to refill her prescription in Idaho and mailed copies of prescriptions there did not change fact that malpractice originated in South Dakota where he initially met with patient).

In fact, it is hard to identify any purposeful contact that Underwood or Doctor Ocasio had with Pennsylvania regarding the treatment of patients. While Mendel lists numerous activities by Underwood and Doctor Ocasio in Pennsylvania, including affiliations with medical organizations in Pennsylvania, associations with Jefferson and personal travel to Philadelphia, none of these activities relate to the injury that Mendel suffered. Accordingly, they cannot be used as a basis for specific jurisdiction in the instant action. *See* 42 Pa. C.S.A. § 5322(c) (cause of action must arise out of contacts which provided basis for specific jurisdiction); *Goodyear, supra* at 472 (specific jurisdiction permitted only to extent that it "arises out of or relates to" very activity that establishes jurisdiction).

Because Underwood and Doctor Ocasio could not have reasonably anticipated being called to court in Pennsylvania based on their treatment of Mendel in New Jersey, they cannot be said to have purposefully established minimum contacts with Pennsylvania. *See Burger King, supra, Aventis Pasteur, supra.*[10] Accordingly,

___

analyze the specific requirements of section 5322(a)(4). *See Walsh, supra* at 784.

**10.** While we recognize that the exercise of jurisdiction in Pennsylvania would promote judicial economy and would not represent a major inconvenience to the defense, these

considerations must be balanced against Pennsylvania's interest in encouraging proper care and treatment of its residents in foreign jurisdictions. *See Kubik, supra.* Limiting jurisdiction over out-of-state doctors to circumstances in which the doctors actively sought to treat Pennsylvania patients helps to ensure

the trial court did not err in determining that it lacked specific jurisdiction over Underwood and Doctor Ocasio.

## B. Venue

■ In her final issue, Mendel notes that the trial court dismissed Mendel's action against Underwood and Doctor Ocasio without addressing the issue of whether venue was proper in Philadelphia. Mendel argues that venue is proper in Philadelphia against the Pennsylvania defendants pursuant to Pa.R.C.P. 1006 because the malpractice action arose in Philadelphia.[11]

After reviewing the trial court opinion and relevant law, we conclude that the trial court correctly disposed of Underwood and Doctor Ocasio's preliminary objections without addressing the issue of venue. Rule 1006 does not create a basis for jurisdiction in Pennsylvania over a foreign cause of action where jurisdiction does not otherwise exist. *See* Pa.R.C.P. 1006(b), *Note.* Because Pennsylvania lacks jurisdiction over Underwood and Doctor Ocasio, the issue of venue in Pennsylvania does not apply. Nor was the trial court required to address venue regarding the Pennsylvania defendants as it was not relevant to the orders at issue. Accordingly, Mendel is not entitled to any relief on this claim.

## IV. Conclusion

Mendel has failed to establish that the exercise of personal jurisdiction over the out-of-state medical providers in the instant action would comport with constitutional principles of due process. Underwood has not engaged in a continuous or systematic course of conduct in Pennsylvania such that general jurisdiction applies. *See Burger King, supra.* Further, neither Underwood nor Doctor Ocasio has purposefully established minimum contacts in this Commonwealth such that Pennsylvania may exercise specific jurisdiction regarding their alleged negligent treatment of Mendel. *See Aventis Pasteur, supra.* Accordingly, the trial court did not err in sustaining Underwood and Doctor Ocasio's preliminary objections.

Orders affirmed.

that Pennsylvania residents will receive adequate medical services wherever they may travel. *See Wright, supra* at 291; *Prince, supra* at 1065, 57 Cal.Rptr.2d 181 ("the citizens of a state are ill-served when specialist physicians feels constrained to prescribe only so much medicine as will get their patients back home").

11. Rule 1006 provides, in relevant part:
   (a.1) Except as otherwise provided by subdivision (c), a medical professional liability action may be brought against a health care provider for a medical professional liability claim only in a county in which the cause of action arose. *This provision does not apply* to a cause of action that arises outside the Commonwealth.
   * * *
   (c)
   (2) If the action to enforce a joint or joint and several liability against two or more defendants includes one or more medical professional liability claims, the action shall be brought in any county in which the venue may be laid against any defendant under subdivision (a.1). This provision does not apply to a cause of action that arises outside the Commonwealth.
   Pa.R.C.P. 1006(a.1), (c)(2).